450 So.2d 634 (1984)
STATE of Louisiana
v.
David NEALY.
No. 82-KA-1591.
Supreme Court of Louisiana.
April 2, 1984.
Dissenting Opinion April 19, 1984.
*635 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Marion B. Farmer, Dist. Atty., Peter J. Garcia, William R. Alford, Asst. Dist. Attys., for plaintiff-appellee.
Thomas J. Ford, Franklinton, S. Austin McElroy, Covington, Indigent Defender Board, for defendant-appellant.
*636 MARCUS, Justice.
David Nealy was indicted by the grand jury for the armed robbery and attempted first degree murder of Mrs. Miriam Jacoby on April 22, 1978 in violation of La.R.S. 14:64 and La.R.S. 14:27 and 14:30. Pursuant to La.Code Crim.P. art. 644, a sanity commission was appointed by the trial judge to determine whether defendant had the mental capacity to proceed as well as his mental condition at the time of the offenses. Upon receipt of the commission's report, a hearing was held on June 20, 1978 at which it was determined defendant lacked the mental capacity to proceed. The trial judge ordered defendant committed to the Feliciana Forensic Facility to receive treatment. Later, defendant was re-examined by the sanity commission but at a hearing on July 22, 1980 it was determined he lacked the requisite capacity and he was recommitted. After defendant was again reported by the superintendent of the mental institution to presently have the capacity to proceed and he was re-examined by the sanity commission, a hearing was held on March 4, 1981 at which it was determined that defendant had the capacity to proceed to trial.[1]
At arraignment, defendant entered a plea of not guilty by reason of insanity to each charge. He waived trial by jury and elected to be tried by the court. After a bench trial in March, 1982, defendant was found guilty as charged and was sentenced to serve fifty five years at hard labor without benefit of parole, probation or suspension of sentence for the armed robbery and forty five years at hard labor for the attempted first degree murder. The court expressly directed that the sentences be served concurrently. Credit was given for time served. On appeal, defendant relies on three assignments of error for reversal of his convictions and sentences.

ASSIGNMENT OF ERROR NO. 1
Defendant contends his convictions were based on insufficient evidence.
Defendant fled from the Southeast Louisiana State Hospital in Mandeville on April 21, 1978 sometime after having been issued a buddy card at 9:10 a.m. which gave him the privilege of walking around the hospital grounds with another patient. In the late afternoon the following day, April 22, defendant was observed by Patrick Navarre exiting the passenger side of a van which had pulled into his Mandeville service station. Defendant walked across a driveway into the Ozone trailer park. Patricia Newton saw defendant about 5 p.m. go to the trailer home of her next door neighbor, Miriam Jacoby, an eighty-one-year-old woman. Mrs. Newton saw defendant later exit the trailer and try a set of keys in Mrs. Jacoby's car, then returned to the trailer for about five minutes and come back out with another set of keys. Mrs. Newton and Mr. Navarre saw defendant drive away in Mrs. Jacoby's car. A few minutes later, Mrs. Newton discovered Mrs. Jacoby on her trailer floor covered by a sheet, her hands tied with the telephone cord and bleeding from several stab wounds.[2] Three days later, defendant was arrested in Slidell, where Mrs. Jacoby's car was recovered. Defendant later admitted his involvement in these charges to Robert Home, a social worker at the Feliciana Forensic Facility, expressing remorse for what he had done to Mrs. Jacoby but excusing his actions as caused by bad medication.
The constitutional standard of review for the sufficiency of evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The statutory rule as to circumstantial evidence is that assuming every fact to be *637 proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La.R.S. 15:438. This statutory rule is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever the state relies on circumstantial evidence to prove an element of the crime. State v. Wright, 445 So.2d 1198 (La., 1984). Ultimately, the Jackson standard is the objective standard for testing the overall evidence, direct and circumstantial, for reasonable doubt. State v. Wright, supra; State v. Sutton, 436 So.2d 471 (La.1983). The statutory rule provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found the defendant guilty beyond a reasonable doubt. Exclusion of every reasonable hypothesis of innocence is therefore a component of the more comprehensive reasonable doubt standard, where circumstantial evidence is used to convict. Thus, although the circumstantial evidence rule (La.R.S. 15:438) may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, it emphasizes the need for careful observance of the usual standard and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence. State v. Wright, supra; State v. Sutton, supra; State v. Chism, 436 So.2d 464 (La.1983).
In the instant case, Mrs. Newton testified that Mrs. Jacoby had phoned her before defendant went to the trailer and that after defendant left she saw no one go in or out of the trailer until she herself went in about fifteen minutes later. The only hypothesis of innocence is that another unseen, violent individual slipped in and out of the trailer and stabbed and bound Mrs. Jacoby in the short time available. We conclude that the jury properly excluded this hypothesis of innocence as an unreasonable one. Therefore, viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that defendant committed armed robbery and attempted first degree murder.
Assignment of Error No. 1 is without merit.

ASSIGNMENT OF ERROR NO. 2
Defendant contends the trial judge erred in denying his motion for a new trial on the ground that he established the defense of insanity by a preponderance of the evidence; hence, no rational trier of fact could have found him sane at the time of the offenses.[3]
Defendant has a history of psychiatric problems dating back to 1972. His medical records establish that defendant is a paranoid schizophrenic whose psychotic disorder is not curable but does get better or worse from time to time. Medication can bring about remission, which describes a continuum or various degrees of lessened symptoms. When medication is not taken, active psychosis returns as the body decompensates or fully metabolizes the drugs over time.
On March 20, 1978, defendant was discharged from East Louisiana State Hospital in Jackson "much improved" and on antipsychotic medication. He returned to the Jackson civil unit on March 31 and apparently was shifted over the next few days through both medical and correctional institutions. It is clear that on April 4 he was admitted to Southeast Louisiana State Hospital in Mandeville with reduced blood pressure and respiratory rates brought on by a severe overdose of antipsychotic medicine. Defendant was sent on April 5 to Charity Hospital, which concluded defendant had suffered a dystonic reaction, a severe stiffening of the muscles caused by his overdose, and therefore stopped defendant's psychotropic medication. On April *638 11, defendant was returned to Mandeville with his psychosis in remission but still suffering from the overdose's physical symptomatology. He remained off antipsychotic medication while his dystonia gradually dissipated. At 9:10 a.m. on April 21, defendant was given a buddy card enabling him to walk around the hospital grounds with another patient. He escaped and committed these crimes against Mrs. Jacoby about 5:00 p.m. on April 22. Norman Breazell of the Mandeville Police Department went to the Slidell police station on April 25 to take defendant into custody and when he first arrived about 8:45 a.m. saw him lying on his side on the station floor. However, when Officer Breazell returned a few moments later, defendant was standing and, after being advised of his Miranda rights, stated that he wished to consult with an attorney before making any statements. Thereafter, he appeared normal to the officer.
At arraignment, defendant entered a plea of not guilty and not guilty by reason of insanity to each charge. At trial, defendant elicited the testimony of three doctors, Dr. Kenneth A. Ritter, a practicing psychiatrist, and Drs. Theresita Jimenez and Aris Cox, staff psychiatrists of the Feliciana Forensic Facility where defendant had been confined before trial, and one social worker, Robert Horne, also of the Feliciana unit in Jackson. Dr. Jimenez first saw defendant in September 1980 at which time defendant was very psychotic. Based on defendant's medical records and her subsequent treatment of him, she testified that at the time of the offenses defendant was unable to distinguish right from wrong. Dr. Jimenez believed that defendant would have decompensated in a week or possibly weeks after he was removed from medication. Dr. Ritter also testified that the antipsychotic drug on which defendant had presumably overdosed would have lost its major effect on someone as severely psychotic as defendant in two or maybe three weeks and that dosages every two weeks is the desired frequency. Based on his examination of defendant on October 21, 1981 and defendant's medical records, Dr. Ritter stated that defendant had not been in a good remission since 1976 and has generally been unable to appreciate the difference between right and wrong. Mr. Horne and Dr. Cox also testified that defendant was actively psychotic and delusional when they saw him in June and July of 1978, respectively.
The state presented two psychiatrists to testify in rebuttal. Dr. Adrian Dean had defendant as a patient at Southeast Louisiana State Hospital in the days leading up to April 22. He saw defendant six to ten times in those eleven days and received progress reports from the hospital staff. Dr. Dean actively evaluated defendant during that period and concluded that defendant knew the difference between right and wrong at the time he issued defendant the buddy card on April 21, signifying defendant's ability to follow the hospital rules and procedures and to communicate adequately. Dr. Dean saw no reason why defendant would not have known right from wrong some thirty hours later and believed it "not likely" that defendant had decompensated in that short interval to such an active psychosis that he would have lost that capacity. Dr. William Bloom, who first saw defendant in May 1978 and served on defendant's sanity commission the following years, agreed that while individuals decompensate at various rates the antipsychotic effect of an overdosage outlasts the dystonic effect. Dr. Bloom stated the probability was "much greater" than fifty percent that defendant had not decompensated in the thirty-hour interval following Dr. Dean's authorization of the buddy card and hence was sane at the time of the offenses. Both doctors testified that the alleged criminal action of defendant in itself did not alter their opinion, as it indicated nothing more than a desire to avoid apprehension.
A legal presumption exists that the defendant is sane and responsible for his actions. La.R.S. 15:432. The defendant has the burden of establishing the defense of insanity at the time of the offense by a preponderance of the evidence. La. *639 Code Crim.P. art. 652. If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing right from wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility. La.R.S. 14:14. In reviewing a claim of insufficiency of evidence in regard to a defense of insanity, this court applies the test set in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. Moore v. Duckworth, 443 U.S. 713, 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979); State v. Noble, 425 So.2d 734 (La.1983); State v. Claibon, 395 So.2d 770 (La.1981).
The evidence indicates that defendant was mentally ill both before and after the criminal acts took place. However, every doctor testified that defendant at times knows right from wrong even though he remains ill. Drs. Ritter and Jimenez, neither of whom saw defendant until over two years after the crimes, admitted that making their determination so much later of defendant's sanity on April 22, 1978 was very difficult. Both agreed that the best person to help the factfinder make its determination was the treating physician at the time closest to the incident. Dr. Dean had defendant in his care for the eleven days prior to the offenses and testified that defendant knew right from wrong on April 21. The crucial issue thus becomes whether defendant decompensated in the following thirty two hours. Drs. Dean and Bloom maintained that defendant probably had not decompensated by the next day. Their opinion is supported both by the evidence that defendant had been overdosed into remission and that decompensation is a gradual deterioration and not a "snap" or sudden spontaneous process as well as by the uncontradicted testimony on defendant's appearance immediately before and after the offenses. All of the witnesses agreed that when defendant is in an actively psychotic state, it is very obvious and can be discerned immediately. The trial judge, in finding defendant sane at the time of the offenses, relied on the conclusion made by Dr. Dean on April 21 in issuing defendant the buddy card that defendant "knows right from wrong and will be continuing to improve for three, four days" in combination with the testimony of Officer Breazell that on April 25 defendant appeared normal and declined to make any statement until he talked to a lawyer. See State v. Poree, 386 So.2d 1331 (La.1980) (on rehearing).
Viewing the evidence in the light most favorable to the prosecution, we conclude a rational trier of fact could have found beyond a reasonable doubt that defendant did not establish the defense of insanity by a preponderance of the evidence. Hence, the trial judge did not err in denying defendant's motion for a new trial.
Assignment of Error No. 2 is without merit.

ASSIGNMENT OF ERROR NO. 3
Defendant contends the trial judge erred in imposing excessive sentences.
The defendant was sentenced to serve fifty five years at hard labor without benefit of parole, probation or suspension of sentence for the armed robbery and forty five years at hard labor for the attempted first degree murder. The sentences were made to run concurrently. The maximum penalties that defendant faced were imprisonment for ninety nine years at hard labor without benefit of parole, probation or suspension of sentence for the armed robbery and fifty years at hard labor for the attempted first degree murder. At the sentencing hearing, the trial judge considered evidence of defendant's personal history and the nature of his crimes. Defendant, single and age twenty five, had no prior convictions and a lengthy medical history. However, the trial judge believed defendant was sane at the time of the offenses and had the capacity to contemplate the serious harm that his vicious *640 attack on the elderly Mrs. Jacoby would cause. The trial judge did consider defendant's mental problems but nonetheless found no significant mitigating circumstances beyond the defense on the merits. He concluded there was a great risk defendant would commit another crime absent confinement and constant correctional treatment.
La. Const. art. 1, § 20 prohibits the imposition by law of excessive punishment. Accordingly, we have held that imposition of a sentence, although within the statutory limit, may violate a defendant's constitutional right against excessive punishment that is enforceable on appellate review. State v. Sepulvado, 367 So.2d 762 (La. 1979). Given compliance with La.Code Crim.P. art. 894.1, a sentence will not be set aside as excessive in the absence of a manifest abuse of the trial judge's wide sentencing discretion. State v. Spencer, 374 So.2d 1195 (La.1979). The penalty imposed must be so grossly disproportionate to the crime committed, in light of the harm caused to society, as to shock our sense of justice. State v. Bonanno, 384 So.2d 355 (La.1980).
Under the circumstances, we are unable to say that the trial judge abused his discretion in sentencing defendant to concurrent terms of fifty five and forty five years. We do not consider the penalties imposed to be so disproportionate to the crimes committed as to shock our sense of justice. Hence, we do not find defendant's sentences excessive.
Assignment of Error No. 3 is without merit.

DECREE
For the reasons assigned, defendant's convictions and sentences are affirmed.
DIXON, C.J., dissents with reasons.
BLANCHE, J., dissents and assigns reasons.
CALOGERO, J., dissents for reasons assigned by DIXON, J.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
Viewing all the evidence in the record in the light most favorable to the prosecution, no rational trier of fact could find beyond a reasonable doubt that the defendant failed to present a preponderance of proof in support of the defense. State v. Price, 403 So.2d 660, 662 (La.1981). Nealy's motion for a new trial should have been granted.
Since 1972 Nealy has suffered from severe mental disturbances. He has been in and out of mental institutions since 1976. Among other things, he thinks that a man in Alaska controls his behavior through a metal plate which the man had inserted in his head. As pointed out by the majority, Nealy was released on March 20, 1978 from East Louisiana State Hospital in Jackson "much improved" and on antipsychotic medication. Nevertheless, eleven days later, on March 31, 1978, he was admitted to another institution, East Feliciana Facility, Civil Side. The admitting doctor's report described Nealy as follows:
"On admission the patient was obviously belligerent, did not shake hands with the examiner and was brimming with hostility. He did not want to cooperate, although he did give some information during the interview. There appeared to be some blocking. There was no perseveration, but probably some looseness of associations and much paranoid associative ideas in his thinking. The patient was hostile but not depressed or elated. Patient had a fixed delusional system in which he thinks the police and the mental health authorities have plotted against him to make him come back to the hospital and that there is in reality nothing wrong with him. He also has heard footsteps in the back part of the house in which he lives. He also had heard people under the house, and he's convinced that this is a plot to get him into trouble and to get him back to the hospital. He denies any visual hallucinations. He has used drugs in the past but none currently. His attention and comprehension seem to be good. He's oriented in all *641 spheres. It was felt the patient was above average in intelligence. The patient's insight and judgment is severely lacking because of his mental illness. Diagnostic impression, schizophrenia, paranoid type." (Emphasis added).
These events illustrate that Nealy could "decompensate" within eleven days and show how fragile this state of "remission" is and was in a case such as Nealy's. Nevertheless, the majority concludes that Nealy had been overdosed into remission upon his return to East Louisiana on April 11 and that he could not have decompensated by April 22.
In reaching the conclusion that Nealy was legally sane on April 22, 1978, when he attacked Mrs. Jacoby, the majority and the trial court rely heavily on the testimony of Dr. Dean, who was the last physician to see Nealy and the one who issued him the buddy pass. Dr. Dean testified that he did not issue buddy passes unless he thought that the patient knew right from wrong, knew the rules, and was able to behave accordingly.[1] In this case, however, he was simply wrong. Nealy escaped.
Dr. Dean was unable to interview Nealy on April 11 because Nealy was still dystonic. His jaw was stiff. He had to be fed and taken care of by the staff. The only other interview of record was on the day Dr. Dean issued the buddy pass. In between, Dr. Dean observed Nealy in the halls and was kept informed by staff reports. The dystonia gradually wore off. The testimony of the other doctors was clear that Nealy's delusional system was not necessarily apparent in a brief interview. Nealy is convinced that it is the medicine which makes him sick. The antipsychotic medication is given to him intramuscularly; he will not take it voluntarily. He is opposed to the doctors and especially to the medication. In short, he resists institutionalization and escaped at the first opportunity upon recovering from the overdose. Dr. Dean's testimony must be viewed in light of the entire record and the other expert opinions.
In support of his plea of insanity, Nealy called four expert witnesses: one social worker and three psychiatrists. All of them were familiar with Nealy's psychosis, having worked with him during his stays in the various mental hospitals and in preparing the sanity commission reports. According to their testimony, it appears that Nealy was and always will be a chronic paranoid schizophrenic. His disease is caused by chemical changes in his brain which affect his thought processes and which cause disorganization and the inability to know right from wrong. They admitted, however, that at times Nealy can be chemically stabilized with the appropriate drugs such that, although insane, he can be held accountable for his actions under the McNaughten standard of knowing right from wrong (R.S. 14:14). This stabilization is known as a remission of the disease, which would mean, in defendant's case, that his hallucinations and delusions have dissipated to an extent that his behavior is partially controlled. In this regard, it is significant and indicative of his sickness that it took over two and one-half years after his attack on Mrs. Jacoby to improve sufficiently to be declared capable of proceeding. It is incredible that such a person could be so easily "overdosed" into remission.
In addition, Drs. Dean and Bloom, the two psychiatrists who testified for the state, agreed with those who testified on Nealy's behalf that if he were taken off his antipsychotic or psychotropic medication he would decompensate to the point that he would no longer be in touch with reality, would have hallucinations and delusions, and would no longer be accountable for his conduct. In particular, Nealy becomes assaultive when not on his medication. The doctors believe that his assaultiveness is related to his mental disease.
*642 The psychiatrists who testified for Nealy believed that Nealy would decompensate within two weeks of not receiving any medication, due to the severity of the chemical imbalance and the nature of his metabolism. The daily doses of medication that he received in order to bring him into a state of remission sufficient for him to stand trial were, according to Robert Horne, the social worker who testified on his behalf, "enough to kill a horse." The two psychiatrists who testified for the state, however, were not as clear on this issue and could only speak of what they had encountered in their experience with other patients. One admitted that it was possible that he could have decompensated by April 22; however, both of them doubted it, stating that the medication normally remains in a person for several weeks or even months. Horne, on the other hand, testified that he personally witnessed such a rapid decompensation when Nealy, at one point, was removed from his medication by a new doctor who felt that the dosages were too high. Nealy, according to Horne, "went to pieces" and had to be restrained for some time thereafter in a straightjacket and put in solitary confinement. It is quibbling whether one calls this a "snap" or "deterioration." When it happens, Nealy is dangerous.
Contrary to Dr. Dean, Nealy's experts also testified that issuing a patient a buddy pass did not mean that that patient was sane or knew the difference between right and wrong; it was simply a method of treatment. In addition, Horne testified that on one or two occasions the doctors would conclude that Nealy was in a sufficient state of remission to allow him to engage in a work therapy program within the confines of the institution, but that on at least one occasion Nealy had tried to leave when given this minimum amount of freedom. Thus, Nealy was capable of misleading even the doctors very familiar with his case.
Regrettably, Nealy's defense counsel did not call Nealy's brothers or his mother to testify about Nealy's behavior after the attack on Mrs. Jacoby and before they brought him to the Slidell police station. Though their testimony might not have been disinterested and would have been lay testimony, it nevertheless would have shed light on his mental condition immediately after the attack.[2] The majority concludes that Nealy's actions after the offense indicate that he was still in a state of remission despite the fact that Nealy was lying on the floor of the police station for five minutes when Officer Breazell arrested him two days after the attack.
Viewing the entire record, including the sanity commission transcripts, and with due respect to the findings of the judge below, no rational trier of fact ought to have concluded beyond a reasonable doubt that David Nealy did not prove by a preponderance of the evidence that he was unable at the time of the attack on April 22, 1978 to distinguish right from wrong. R.S. 14:14; Moore v. Duckworth, 443 U.S. 713. 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979) (per curiam); State v. Roy, 395 So.2d 664 (La.1981). Although the state did introduce rebuttal evidence, it was insufficient to affect this conclusion. Nealy was probably legally insane prior to the overdose which resulted in ultimately withholding his medication from him. Even if he was in a state of remission, he proved by a preponderance of the evidence that he would have decompensated by the time of the attack on Mrs. Jacoby, some two and one-half to three weeks after his last dosage of antipsychotic medication.
The picture that emerges from this record is that David Nealy is a cunning, dangerous, and yet very sick individual. There is no question that he needs institutionalization *643 in a secure environment where he can receive professional help. His illness is permanent; he will never recover. The place for him is an institution where people are trained and equipped to handle people like Nealy, not a prison.
BLANCHE, Justice (dissenting).
I respectfully dissent. The evidence depicts Nealy as a person with severe mental disturbances to the extent of being incurably insane. Nealy was dilusional as well as hostile and dangerous. He was obsessed with fear of hospitalization and being required to take medication.
The responsibility for this crime hinges on whether Nealy had decompensated from the tremendous doses of thorazine which had been previously administered to him. The only cogent evidence that defendant might not have decompensated came from the testimony of the treating physician who issued the buddy pass which facilitated defendant's escape. Weighed against the overwhelming evidence of Nealy's condition prior to and after his escape and testimony of four expert witnesses which established that Nealy could have decompensated two weeks after treatment was suspended, the State's evidence is insufficient to rebut defendant's claim of insanity. Therefore the defendant has shown by a preponderance of the evidence that he was insane at the time of the offense.
NOTES
[1] None of these commission reports nor a later one on August 31, 1981, addressed the question of defendant's mental condition at the time of the offenses.
[2] Mrs. Jacoby did not testify at trial, having died on December 16, 1978 from an unrelated cause.
[3] Defendant neither briefed nor argued this assignment of error on appeal; therefore, normally it would be considered abandoned. State v. Carlisle, 315 So.2d 675 (La.1975). However, this assignment of error is nevertheless before us because of a pro se brief filed with this court by defendant's brother before the case was submitted.
[1] Mrs. Jacoby subsequently filed a civil action against the state for negligence in allowing Nealy to escape. Jacoby v. State, through Department of Health and Human Resources, 434 So.2d 570 (La.App.1983), writ denied, 441 So.2d 771 (La.1983).
[2] Nealy's brother relates in his pro se brief to this court how he and another brother found Nealy the day after the crime in a "very bad mental condition" and how they took him to the police seeking medical attention. He points out that Nealy was under the state's care prior to the attack and was immediately placed back in a mental institution for two years following his arrest and prior to his trial. He argues that Nealy, therefore, must have been insane at the time of the attack. He blames the state for allowing Nealy to escape. He reiterates Nealy's claim that Nealy should have been found not guilty by reason of insanity.