514 So.2d 747 (1987)
STATE of Louisiana, Appellee,
v.
Olan Wayne BRANTLEY, Appellant.
No. 19111-KA.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1987.
*748 Davenport, Files & Kelly by Tom Davenport, Monroe, for appellant.
William J. Guste, Jr., Atty. Gen., James A. Norris, Jr., Dist. Atty., John Spires, Asst. Dist. Atty., Monroe, for appellee.
Before HALL, MARVIN and NORRIS, JJ.
NORRIS, Judge.
Olan Wayne Brantley was charged by bills of information with multiple counts of issuing worthless checks, LSA-R.S. 14:71. He pled not guilty and not guilty by reason of insanity. On the basis of a sanity commission's recommendation that he was competent to stand trial, Brantley proceeded to a bench trial. The trial court found the evidence insufficient on some of the counts and entered not guilty verdicts on them, but found Brantley guilty on two counts, one less than $100 and the other in excess of $500. In well-considered oral reasons, the court rejected the insanity defense. It sentenced Brantley to six months in parish jail on the misdemeanor and six years at hard labor on the felony, to be served concurrently.[1] Brantley now appeals, claiming that the evidence was insufficient to support the verdict and that the sentence is excessive. For the reasons expressed, we affirm.
The felony charge arose out of an incident at Bennett Electric Company in Bastrop. On June 22, 1985, Brantley came to the store and bought a Quasar TV and VCR. Mrs. Bennett, who runs the store with her husband, wrote up the receipt and accepted the check. She positively identified Brantley at trial and remembered the details of the transaction. When Brantley said he would pay by check, he produced a blank "counter check" from Marion State Bank. A "counter check" does not have the account-holder's name imprinted but is a blank form provided as a convenience when a depositor runs out of personalized checks. Brantley asked Mrs. Bennett to fill in the payee's name and the amount; he then signed the check and wrote in his address and phone number. Mrs. Bennett looked at his driver's license and copied the license number onto the check. She described Brantley as well-dressed and outgoing; she noted that he talked with her husband a good deal. Brantley left with the merchandise. When Mrs. Bennett deposited the check, it came back marked "no account." The Bennetts mailed him a ten-day notice of nonpayment in accord with LSA-R.S. 14:71A(2), but they never received a cent of the $898.70; however, Brantley's mother, Mrs. McKinney, wrote to Mr. Bennett, acknowledging the check and asking for a description of the property so she might return it or pay for it in installments. It was never returned.
The state presented the testimony of Deborah Foley, an expert handwriting analyst, who compared examplars of Brantley's handwriting with the signature and other writing on the check. She concluded that the identification was positive.
The state also called as a witness Mrs. McKinney, Brantley's mother, who testified that since 1978 or 1979, he had been in constant trouble with bad checks. She testified, however, that her son had mental problems and was probably not aware that *749 he had written the checks; at least he has always denied it when confronted. According to Mrs. McKinney, the problems began when Brantley's uncle was killed in an automobile accident; about the same time, Brantley sustained a serious back injury and received a large workers compensation settlement. He quickly spent the money and got in trouble with his first bad check.
Several witnesses described the manifestations of Brantley's mental condition. He was subject to serious mood swings, sometimes hyperactive and energetic, sometimes seriously depressed. During the hyperactive phases, he was talkative, "fractious," and able to tell fantastic stories; during depressed phases he was restless, isolated and unable to sleep. He initially underwent treatment at the LSU Medical Center under Dr. Steinberg in May and June 1980, where he was diagnosed as a manic depressive. He was placed on a medication, lithium, to keep the condition under control.
There was also a great deal of expert medical evidence, all of which came in the form of reports and transcripts of sanity commission testimony. When he was first prosecuted for a worthless check, he claimed insanity and was examined by Dr. Richie as part of a sanity commission. Dr. Richie's report of September 1980 concurred in the diagnosis of manic depression and expressed the opinion that the alleged spending spree was a result of delusions associated with the manic phase. Dr. Richie noted that with the administration of the proper drugs, lithium carbonate and Tofranil, Brantley's condition was held in control and he was competent to proceed. He reiterated, however, that the illness prevented Brantley from distinguishing right from wrong at the time of the offense. Dr. Dearman, the other member of the commission, expressed the same opinion. On the basis of these diagnoses, the trial court found him not guilty by reason of insanity. He was committed to the Central State Hospital in Alexandria for treatment in February 1981. The physicians advised that though manic depression is not curable, it may be kept in remission by the constant administration of lithium. Carl Gardner, a nurse who has recently treated Brantley, said that if Brantley could maintain a lithium level of .78 to 1.0, his behavior would be normal. The reports from Central State Hospital indicate that Brantley seemed well enough to be discharged within 60 days of admission, but by court order he was held until August 1981, approximately five and a half months.
Once out, Brantley resumed writing checks without an account. He claimed not to remember any of the alleged incidents. He complained about having to take medicine for the rest of his life without ever getting well, and sometimes stopped taking it altogether. Mrs. McKinney and another relative, Mr. Manning, confirmed that he periodically went without the lithium and that his conduct would then become erratic. They suspected that his criminal conduct occurred when his lithium level had dropped too low.
In 1982, Brantley was again prosecuted for issuing worthless checks. He was jailed in March on two counts. In June, he was rushed to E.A. Conway Hospital in Monroe after an attempted suicide. Dr. Anderson, who treated him, noted complaints of severe headaches and hallucinations. He confirmed the diagnosis of manic depression but felt that it was in remission. Another sanity commission was ordered, in which Dr. Erwin found that Brantley was not presently competent to proceed. The trial court agreed and ordered him committed once again, in October 1982, to Central State Hospital. The record does not show the exact length of this stay; he estimated it at six or seven months. The record does include medical reports from Drs. Lowe and Angell, who examined Brantley in May 1983, and reported that he was competent to stand trial. Apparently no official action was taken pursuant to these reports.
Upon release, Brantley again resumed writing bad checks. In March 1984, he admitted himself to Woodland Hills Hospital in West Monroe, where he was examined by Dr. Sherman, who found him to be in a "hypomaniac" state, less severe than true mania. After a few days at Woodland Hills, Brantley checked out and immediately *750 admitted himself to Brentwood in Shreveport. There he was examined by Dr. Richie, who had previously seen him in September 1980 and had issued the report that led to his first commitment. This time, however, Dr. Richie's opinion was somewhat changed. He thought that if a patient was in a manic state and wrote bad checks, and then admitted himself to a mental hospital, he was "quite possibly" able to recognize that he was sick. After his discharge, Brantley was jailed in Morehouse Parish for several months in 1985 and in Ouachita Parish from January 1986 until the instant trial in September 1986. A sanity commission had been appointed and found him competent to proceed; it had also expressed new opinions on his ability to distinguish right from wrong at the time of the offenses. The details of this commission's findings will be outlined with the argument of the first assignment of error.

ASSIGNMENT NO. 1
By his first assignment Brantley contends that a rational factfinder should have found that he proved insanity at the time of the offense by a preponderance of the evidence, even if the evidence is viewed in light most favorable to the prosecution. A defendant is presumed to be sane and the state is not required to prove his sanity. LSA-R.S. 15:432. A defendant who wishes to negate the presumption must put forth an affirmative defense of insanity and prove it by a preponderance of the evidence. LSA-C.Cr.P. art. 652; State v. Claibon, 395 So.2d 770 (La.1981); State v. Pettaway, 450 So.2d 1345 (La.App. 2d Cir. 1984), writ denied 456 So.2d 171 (La.1984). The defendant must show that he suffered from a mental disease or defect that rendered him incapable of distinguishing right from wrong with reference to the conduct in question. LSA-R.S. 14:14; State v. Roy, 395 So.2d 664 (La.1981). On appeal, the relevant inquiry by the reviewing court is whether the defendant adduced evidence of his insanity at the time of the offense such that any rational trier of fact viewing the evidence in light most favorable to the prosecution could conclude that defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Nealy, 450 So.2d 634 (La.1984). This determination is made after reviewing all the evidence in the record, both expert and lay testimony. State v. Pettaway, supra.
All three members of the most recent sanity commission testified at a hearing in February 1986. A transcript of their testimony was admitted by stipulation. Dr. Richie had examined Brantley in 1980 and again in 1984. He testified that a patient in the manic phase will lose sleep, spend money and talk a lot. He said, however, that spending sprees are not typical. He also said that most patients are very aware of the changes that will take place in them if they stop taking their medication. He concluded that this illness does not preclude a patient from distinguishing right from wrong; although he thought differently about Brantley in 1980, he would re-assess his opinion in light of the recent incidents.
Dr. Moore examined Brantley several days before the hearing. He asked Brantley about each of 16 pending charges and Brantley denied any recollection of 15 of them. As for the last one, he replied that he could not have committed the offense because he was in the hospital on that date. This particular remark led Dr. Moore to conclude that Brantley was affecting selective amnesia. He also noted that Brantley's allegedly criminal acts tended to aim at getting items that he could personally use and enjoy, thus undercutting any claim that he was out of touch with reality. Dr. Moore felt that a manic patient who cannot tell right from wrong will appear out of touch with reality, even to a lay person; Brantley appeared to be in control, and Dr. Moore concluded he was not insane.
The final expert, Dr. Sherman, had examined Brantley in March 1984 at Woodland Hills and again in early February 1986. He testified that Brantley's condition was not as bad in 1986 as it had been in 1984; in fact, he appeared to be only in a "hypomaniac" *751 state, which is less severe than true mania. Dr. Sherman testified that in extreme cases, a manic state can interfere with the ability to tell right from wrong, but this is usually associated with such severe distortions that even a lay person could tell there was something wrong. He added that hypomania did not impair a patient's ability to tell right from wrong. When asked whether Brantley might have made a conscious choice not to take his medicine, Dr. Sherman explained that some patients enjoy the manic "high"; and that someone who has once escaped criminal liability on account of mania is aware of this. He concluded that if Brantley had been out of control when he wrote the bad checks, the merchants would have noticed something wrong. Like Dr. Moore, Dr. Sherman did not think Brantley was unable to distinguish right from wrong.
What the merchants observed, however, was far from a raving maniac. Mrs. Bennett described him as "outgoing" and "very friendly," and a nicely dressed "person of means" who dispelled any doubt that he might not be able to cover the check. R.p. 53. The complainant in the misdemeanor case described him as "happy," and ascribed this to the fact that he and his friends were about to have a party on the river. She denied that he was overtalkative or that his conversation tended to run away. R.p. 60.
The defense presented testimony of other witnesses, Mr. Manning, Mr. Snell and Mr. Hayes, who all testified to seeing unusual conduct on Brantley's part. However, these descriptions were within the normal bounds outlined by the physicians and they bore no resemblance to the calm, natural conduct that Brantley exhibited when writing the worthless checks to Mrs. Bennett and Ms. Shipp. The trial court concluded from this lay testimony and from the traits described by the physicians that Brantley was not manic at the time of the criminal transactions. The court further noted, after observing Brantley's facile denials on the witness stand, that he was impressed with Dr. Moore's diagnosis of "selective amnesia." R.p. 145. Viewed in light most favorable to the state, the totality of evidence is insufficient to prove by a preponderance that Brantley was, at the time of the offenses, unable to distinguish right from wrong.
The testimony from the prior sanity commissions, relied on heavily by the defense on appeal, pertained to Brantley's condition long before the commission of the instant offenses and before he was stabilized with lithium. When compared with the more recent reports, the earlier reports suggest that a previously acute condition had been brought to a satisfactory stage of remission by the time of the instant offenses. Brantley's medical progress is most evident in Dr. Richie's testimony, R.p. 185.
The evidence would also support the further conclusion that even if Brantley's conduct was somehow influenced by mild mania or a "hypomaniac" state, then this condition was brought on by his conscious choice not to take the medicine which keeps it under control. He testified he knew it was wrong to write bad checks and steal from people; he also admitted that if he stopped taking the medicine, he would have these problems. He testified that one doctor told him he might eventually be able to stop taking lithium, and it was only in the hope that he might be completely cured that he ever stopped taking it. However, this is contrary to every medical report and all the expert testimony, which was unanimous in labeling Brantley's condition as incurable. Given the clarity of the evidence on this point, we cannot imagine any physician ever telling him that he might safely withdraw from the drug. If Brantley was able to make the conscious choice not to take the medicine, thereby allowing himself to lapse into a manic state which he knew would affect his criminal liability, then he should be accountable for his acts of general criminal intent, committed while in the voluntarily induced manic state. Cf. LSA-R.S. 14:15. We nevertheless emphasize that according to the witnesses who accepted the checks and the doctors who participated in the most recent sanity commission, Brantley was not in a genuine "manic" state at the times of the offenses *752 and he failed to prove an inability to tell right from wrong.
This assignment does not present reversible error.

ASSIGNMENT NO. 2
By this assignment Brantley claims the sentence imposed is excessive. The claim of excessiveness is two-tiered. The first level addresses the trial court's adherence to the sentencing guidelines of LSA-C.Cr.P. art. 894.1. The judge is not required to list every aggravating or mitigating circumstance as long as the record reflects that he adequately considered the guidelines. State v. Smith, 433 So.2d 688 (La.1983). The purpose of the article is to establish a factual basis for the sentence, and not to produce rigid, mechanical compliance with its provisions. Where the record shows an adequate factual basis for the sentence imposed, remand is unnecessary even in the absence of full compliance with art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements to be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981).
In the instant case the judge stated for the record that he had considered the art. 894.1 factors and found only one to operate in Brantley's favor. The judge specifically cited Brantley's age, marital status and family ties. R.p. 152. The question of mental health pervades the record and bears on the potential for rehabilitation; the judge noted that "no one can keep Mr. Brantley from writing worthless checks." R.p. 153. Prior criminal record included a felony conviction for issuing worthless checks in Sabine Parish in April 1980, for which he was placed on supervised probation, and a recent guilty plea in Union Parish. Thus Brantley did not qualify for a suspended or probationary sentence for this offense. LSA-C.Cr.P. art. 893. Prior criminal conduct included a stunning 16 arrests, mostly for worthless checks and theft by fraud, and six of these occurred while he was on parole. The failed probationary period, the constant psychiatric treatment and the unflagging determination to engage in this sort of criminal activity counseled in favor of correctional treatment and persuaded the trial judge that a lesser sentence would deprecate the seriousness of the offense. The only mitigating circumstance was the victims' tendency to facilitate the offense by accepting such risky checks without careful verification. The record reflects that the judge gave ample consideration to this factor and that his compliance with art. 894.1 was adequate.
The second tier is constitutional excessiveness. A sentence may be deemed excessive if it is grossly out of proportion to the severity of the offense or amounts to nothing more than a needless and purposeless imposition of pain and suffering. LSA-Const. Art. 1 § 20; State v. Bonanno, 384 So.2d 355 (La.1980); State v. Cunningham, 431 So.2d 854 (La.App. 2d Cir. 1983), writ denied 438 So.2d 1112 (La.1983). Within the statutory limits, however, a trial judge has wide discretion in imposing a sentence; a sentence within the statutory limits will be set aside only in the event of manifest abuse of discretion. State v. Square, 432 So.2d 104 (La.1983). In selecting a proper sentence, the judge is not limited to considering only prior convictions, but may properly review all prior criminal activity. State v. Palmer, 448 So.2d 765 (La.App. 2d Cir.1984), writ denied 452 So.2d 695 (La.1984); State v. McKethan, 459 So.2d 72 (La.App. 2d Cir.1984).
Brantley's sentencing exposure under LSA-R.S. 14:71 C was a maximum sentence of ten years, with or without hard labor, or a maximum fine of $3,000, or both. The six-year sentence imposed was well within the limits. No fine was imposed and restitution was not ordered. Considering the prior convictions and the frequent arrests, which underscore his propensity for this kind of crime, we cannot say that the sentence is truly excessive. Though severe, it does not shock our sense of justice. This assignment does not present reversible error.
*753 For the reasons expressed, the conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] This appeal pertains only to the felony count, case No. 86-95A, Morehouse Parish. Brantley did not perfect writs as to the misdemeanor charge, 84-2612A, Morehouse Parish.