544 So.2d 41 (1989)
STATE of Louisiana, Appellee,
v.
Hury VANCE, Appellant.
No. 20454-KA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1989.
Rehearing Denied June 1, 1989.
*42 Indigent Defender Office, by Allan R. Harris, Richard E. Hiller, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Howard Fish, Tommy Johnson, Catherine M. Estopinal, Asst. Dist. Attys., Shreveport, for appellee.
Before HALL, C.J., and SEXTON and LINDSAY, JJ.
HALL, Chief Judge.
Defendant, Hury Vance, was charged by indictment with second degree murder with a firearm in violation of LSA-14:30.1 and 14:95.2. Defendant was tried and found guilty as charged. He was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence on the murder charge and to two years at hard labor without benefit of parole, probation or suspension of sentence for committing the murder with a firearm, the sentences running consecutively. Defendant appealed raising seven assignments of error. He only briefs and argues three assignments; the others are considered abandoned. For the reasons which follow, we affirm defendant's convictions and sentences.
On the evening of January 13, 1987, defendant and the victim, Tyrone Fredieu, were working the graveyard shift as custodians at L.S.U. Medical Center in Shreveport. Defendant was a supervisor, and he gave the victim and other workers their assignments for the night. Shortly thereafter defendant and the victim were waiting for an elevator near the admitting office on the first floor. After the elevator door opened and prior to their entering the elevator they began to fight and scuffle on the floor. While the victim was still on the floor defendant stood up. As the victim stood up defendant took his gun out of his pocket and shot the victim four times. The victim was rushed to the "code room" where he died.
Assignment of Error No. 1
Through this assignment of error defendant contends that the trial court erred in not granting a new trial since there was insufficient evidence upon which to convict him. Defendant contends that the state failed to show that he had the specific intent to kill the victim. He argues that he acted in self-defense which justifies the homicide.
The constitutional standard of review for the sufficiency of evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Nealy, 450 So.2d 634 (La.1984); State v. Lewis, 535 So.2d 943 (La.App. 2d Cir.1988). When self-defense is raised as an issue by the defendant, the state has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. State v. Savoy, 418 So.2d 547 (La. 1982).
LSA-R.S. 14:30.1 provides in part:
*43 A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
. . . .
LSA-R.S. 14:95.2 provides in part:
A.... [A]ny person who uses a firearm or explosive device at the time he commits or attempts to commit the crime of second degree murder ... shall upon conviction serve a term of two years imprisonment for the first conviction.... LSA-R.S. 14:20 provides in part:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger; or
. . . .
We find that there was sufficient evidence, viewed in the light most favorable to the prosecution, to prove the elements of second degree murder with a firearm beyond a reasonable doubt. Furthermore, there was sufficient evidence for a rational fact finder to conclude beyond a reasonable doubt that defendant did not reasonably believe he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary to save himself from that danger.
Bonnie Tillman, a custodian at L.S.U. Medical Center, testified. He stated that on January 13, 1987 between 11:30 and 12:00 p.m. he was on an elevator with a trash cart. When the elevator doors opened on the first floor he saw both defendant and the victim standing and smiling at each other. As defendant started to get on the elevator he bumped into Tillman's trash cart. The victim was standing somewhat behind defendant but he did not push defendant into the cart. Tillman told defendant to wait a minute so that he could move the cart. At that point the victim mumbled something which Tillman did not understand. Defendant said, "Enough." Defendant swung around and hit the victim causing the victim to fall backwards. Defendant stayed on top of the victim and continued hitting him. After defendant got off the victim he stepped back, reached into his pants, and retrieved his pistol. Defendant fired two shots into the victim's chest area. Tillman then allowed the elevator doors to close, and he went to the ground floor.
Tillman further testified that the victim did not impress him with his fighting ability. Defendant had no reason to shoot the victim because he had already beaten him. Tillman was two to three feet away from them, and he did not see anything in either person's hands. The victim was not standing completely erect when defendant started shooting him. During the shooting the victim and defendant were not holding on to each other.
Micheal Clark, a custodian at L.S.U. Medical Center, testified. He said that defendant and the victim did not get along very well. Clark brought the victim to work on the night of the shooting. Clark's assignment for that night was to strip, seal, and wax the main lobby. He testified that generally the housekeepers will use a putty knife to scrape the gum off the floor. Defendant told the victim to sweep, mop, and buff the burn unit, SER Room, the main hallways, and waiting area in front of admitting. Clark was in the janitorial closet in the medical emergency room when he heard the shots. Defendant was with Clark and Ron Fuller at the janitorial closet about three or four minutes prior to the shooting, and defendant made the statement that he was going to see if the victim had started his assignment. After hearing the initial shots Clark came through the door and stopped. He saw the victim hanging on defendant and looking up at defendant with blood rushing out of his mouth. Defendant "kneed" the victim, hit him with his fists, and finally knocked the victim to the floor.
Sharon Pettis, a custodian at L.S.U. Medical Center on the date of the shooting, testified. She heard gunshots while she was inside of the locker room in the surgical emergency room. She saw the victim at defendant's knees. Defendant was *44 pointing downward with a gun. Pettis did not actually see the gun. The victim stated, "Please, don't shoot me no more." Defendant shot the victim one more time. Pettis made a prior statement to the Shreveport Police Department stating that she saw the gun.
Mary Stickman, a burn technician at L.S. U. Medical Center on the night of the shooting, testified. She was standing at the corner of the emergency room when she heard defendant and the victim arguing. She could not understand the argument but noticed that defendant pushed the victim into the door. She did not see any weapons but heard the gunshots.
Diane Fultz who worked in the patient processing department at L.S.U. Medical Center testified that she talked to the victim about five minutes before she heard the shots. The victim was in a good mood. After hearing shots, she ran to the opening of her office and saw the defendant with a gun in his hand.
Ernest Dickey, a security guard at L.S.U. Medical Center, heard the gunshots and went to the admitting area. He saw defendant fire approximately two to three shots from a very close range of approximately one foot. Two shots were fired after Dickey told the defendant to stop firing. The victim was falling when the last shot was fired.
George McCormick, a forensic pathologist and coroner for Caddo Parish, testified that the victim was shot four times. One bullet entered at the left side of the chest, passed through the right lung, and went into the heart. A second bullet entered the left upper part of the back. A third bullet went through the victim's right upper arm into the right side of his chest where it struck a rib. The fourth bullet entered the right forearm and split. A part of this bullet entered the victim's neck. When the bullets came out of his arm and re-entered his chest and neck they went downward. This was consistent with the victim's arm being in a position above the uppermost wound. He considered the wounds in the arm to be defensive, consistent with a person placing an arm or leg between himself and the assailant to ward off the assailant. The victim weighed approximately 190 to 200 pounds and was 510" tall. His blood ethanol level was 0.04 percent.
Terry Franklin, a criminalist with North Louisiana Criminalistics Laboratory, testified that two of the wounds were shot from a range of three to six inches. The other two shots were fired from a distance of six to twelve inches.
All of the witnesses who were asked testified that there were no weapons found or seen in the area other than the gun dropped by the defendant. George Camp who worked in the emergency room at L.S. U. Medical Center testified that he found a wallet, keys, a putty knife, and a hair pick in the victim's pocket.
Defendant testified on his own behalf. On the night of the shooting he started out walking to work since he did not have any transportation. He carried his .22 caliber pistol for protection. While he was walking to work his girlfriend passed by him, picked him up, and took him to work. He got to work early and began doing paperwork. He forgot to put the pistol in his locker. Defendant then gave the victim and others their work assignments for the evening. The victim told defendant that there would not be any sitting down tonight. Defendant told the victim not to worry about other people. The victim appeared "red-eyed" and seemed to be under the influence of something.
Prior to the shooting defendant and the victim were on their way to the housekeeping office to get additional equipment. Defendant heard Micheal Clark state, "Man, you crazy. You know you and Vance don't get along." They then went to the elevator and waited for approximately 30 seconds. When the elevator door opened defendant started to get on it. The victim rushed up behind him and bumped him from behind. The victim then rammed his hand up defendant's rear-end. Defendant bumped into the trash cart. He told the victim, "Wait a minute. Give me time to get on the elevator." The victim was standing, shaking his penis, looking "weird-eyed", and grinning. Defendant was scared. Defendant turned *45 around and started to get on the elevator. The victim rushed up behind him, bumped him, and rammed his hand up his rear-end. Defendant almost fell into the trash cart. The victim walked down the hall, and defendant followed him to find out what was wrong. The victim was still shaking his penis and looking "weird-eyed." Defendant noticed other housekeeping workers standing and looking toward them. They were acting as though they were expecting something to happen.
The victim then made a threatening motion toward defendant which provoked him to strike the victim. When defendant struck the victim the victim caught him in the collar. Defendant tried to break free but the victim threw him to the floor. The victim fell on top of defendant. Defendant continually tried to get free. Defendant then heard the victim state, "I'm going to kill you." The victim's statement scared defendant so bad that he broke free. The victim reached for his own waistline, and defendant thought that the victim was reaching for a weapon. Defendant then remembered that he had his gun. While the victim was standing up with his hands underneath his jacket defendant fired the first shot. When the victim moved his hand and brought it from underneath his jacket it caused defendant to shoot the second shot. The victim then lunged forward and swung wildly at defendant causing defendant to fire the third shot. At that point the victim was grabbing at him trying to get the pistol. While the victim was trying to get the gun he fired again. The victim was about to pull defendant down and defendant had to catch the victim by the hair to pull him off of him. Defendant then saw blood coming from the victim's mouth.
Defendant is partially blind in the left eye and weighs between 159 to 163 pounds. Defendant stated that while he was firing he was not sure whether he had hit the victim or not. He never saw the victim with a weapon.
Viewing the evidence in the light most favorable to the prosecution a rational fact finder could have found beyond a reasonable doubt that defendant committed second degree murder with a firearm and that defendant did not act in self-defense.
Defendant fired at least four shots with his .22 caliber pistol which hit the victim in various parts of his body. Two shots were fired from the range of three to six inches from the victim. The other shots were fired from a range of six to twelve inches. The coroner testified that the victim died from severe loss of blood pressure and heart and lung function due to blood loss caused by multiple gunshot wounds. The fact that defendant fired the gun at the victim multiple times indicated his culpable state of mind and satisfied the specific intent to kill or inflict great bodily harm requirement of second degree murder.
Defendant did not reasonably believe that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary to save himself from the danger. Tillman's and defendant's testimony indicate that defendant turned around and hit the victim first. According to Tillman the victim did not impress him as a fighter, and defendant had gotten the best of the victim. Tillman stated that as the victim got to his feet defendant began shooting. Defendant testified that the victim scared him when he rammed his hand up his rear-end and stood there shaking his penis. He only struck the victim after the victim made a threatening motion toward him. Defendant further stated that the victim threatened to kill him and reached for his waistband. After the first shot he continued to fire the gun trying to prevent the victim from getting him.
The victim's hands were empty and no weapons were found on the victim. Defendant did not see any weapons and did not present any evidence of the victim's propensity for causing harm to defendant or others. The jury was entitled to and did reject the testimony of defendant. The state met its burden of proof. This assignment of error lacks merit.
Assignment of Error No. 5
Through this assignment of error defendant contends that the trial court deprived *46 him of his right to counsel since during the closing arguments defense counsel attempted to object to statements made by the state and the trial court told counsel to sit down.
The record indicates that prior to closing arguments the court instructed counsel for the state and the defense not to object to closing arguments unless there was an egregious breach of the law. Despite the trial court's instruction defendant objected to the following argument made by the state:
MR. FISH: ... Now, you as citizens can certainly imagine circumstances where if somebody were to tell you they were going to kill you, it might put you in fear for your life. But that would only be true if, like under this fourth position, the defendant's knowledge of his assailant's dangerous character, like if you had had a long history of running feuds with this man, or had athere had been other incidents where he threatened him or had they brandished weapons to each other.
MR. HARRIS: Your Honor, if I may, I would like to make an objection at this point.
THE COURT: Sit down.
MR. HARRIS: Objection. Is the Court saying that I cannot make the objection?
THE COURT: Just sit down.
MR. HARRIS: Well, I would like to note the objection on the record as to the Court's not allowing me to make the objection.
THE COURT: Continue, Mr. Fish.
The court has the duty, and the authority, to require that the proceedings be conducted in an orderly and expeditious manner and to so control the proceedings that justice is done. The court is given wide discretion in controlling the conduct and orderly process of the trial. LSA-C.Cr.P. Art. 17; State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied 466 U.S. 993,104 S.Ct. 2374, 80 L.Ed.2d 847 (1984); State v. Chaisson, 425 So.2d 745 (La.1983); State v. Passman, 345 So.2d 874 (La.1977). This authority and discretion includes regulating the manner in which objections to closing arguments will be handled.
The state was not making an improper argument when defendant tried to object. Factors to consider in deciding whether defendant reasonably believed that the killing was necessary include the possibility of retreat and defendant's knowledge of the victim's dangerous character. Comments to LSA-R.S. 14:20; State v. Hardeman, 467 So.2d 1163 (La.App. 2d Cir.1985); State v. Brockington, 437 So.2d 994 (La.App. 3d Cir.1983). Defendant presented his argument after the state completed its argument. After argument and out of the presence of the jury, defendant was allowed to state the basis for his objection but he did not articulate any reason why he wanted to object. We find no basis for any objection by the defendant to the prosecutor's closing argument.
By telling defense counsel to "sit down" the trial court did not comment on the evidence. The court's statement was undoubtedly made with an awareness that there was nothing objectionable about the prosecutor's argument and, although done in an abrupt fashion, amounted to nothing more than an overruling of any objection defense counsel might make at that time. The court's statement, even if improper, was harmless, did not influence the jury, and did not contribute to the verdict. See LSA-C.Cr.P. Art. 921. This assignment of error lacks merit.
Assignment of Error No. 7
Through this assignment of error defendant requests that the court review the record for any errors patent on the face of the record. We find no errors patent. This assignment of error lacks merit.
Accordingly, defendant's convictions and sentences are affirmed.
AFFIRMED.
ON APPLICATION FOR REHEARING
Before HALL, SEXTON, LINDSAY, NORRIS and HIGHTOWER, JJ.
Rehearing denied.