548 So.2d 29 (1989)
STATE of Louisiana
v.
Mark JACKSON.
No. 89-KA-114.
Court of Appeal of Louisiana, Fifth Circuit.
June 16, 1989.
Martha E. Sassone, Indigent Defender Bd., Gretna, for defendant-appellant.
John M. Mamoulides, Dist. Atty., James Weidner, Dorothy A. Pendergast, Asst. Dist. Attys., (Louise Korns, of counsel), Gretna, for plaintiff-appellee.
Before CHEHARDY, GAUDIN and GRISBAUM, JJ.
GRISBAUM, Judge.
This is a criminal matter relating to firstdegree murder. We affirm the conviction and sentence.
*30 PROCEDURAL HISTORY
On September 25, 1986 a grand jury indictment was filed charging the defendant, Mark Anthony Jackson, with a violation of La.R.S. 14:30, in that he committed first-degree murder of Lac V. Ngo while engaged in the perpetration of an armed robbery. An order appointing a sanity commission was signed on September 4, 1986. On October 2, 1986, following a hearing, the trial court found that the defendant lacked the mental capacity to understand the proceedings against him or to assist counsel in his defense. By an order signed October 6, 1986 the defendant was committed, pursuant to La.C.Cr.P. art. 648, to the custody of the Louisiana Department of Health and Human Resources.
On February 5, 1987, the trial court was informed that the defendant was competent to stand trial, and on March 12, 1987, another sanity hearing was conducted. After hearing, the court found the defendant competent to stand trial and to assist counsel in his own defense. The defendant was arraigned and entered a plea of not guilty and not guilty by reason of insanity.
Another sanity hearing was held on May 21, 1987. After hearing, the court once again found the defendant legally sane and able to assist counsel in his own defense.
Following several continuances, the defendant was tried by a 12-person jury on September 12, 13, 14, 15, and 16, 1988. The jury, on September 16, 1988, unanimously found the defendant guilty of second-degree murder. After waiving all legal delays, the defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. After his motion for new trial was denied, the defendant appealed.
BASIC FACTS
On August 21, 1986, at approximately 11 a.m., the defendant, armed with a gun, entered the Tip-Top Grocery Store located at 3900 U.S. Highway 90 in Jefferson Parish. While in the process of robbing the store, the defendant shot and killed Lac Van Ngo, the owner of the Tip-Top Grocery.
ASSIGNMENTS OF ERROR
(1) Whether the jury erred in not concluding that the defendant was legally insane at the time of the commission of the offense;
(2) Whether the trial court erred in granting the State's peremptory challenge of three black jurors; and
(3) Whether error patent exists.
ASSIGNMENT NO. 1
Law
The pertinent analysis is to be found in State v. Claibon, 395 So.2d 770 (La.1981), to wit:
In Louisiana a defendant is presumed sane and the state is not required to prove sanity. R.S. 15:432.2 A defendant who wishes to negate the presumption must put forth an affirmative defense of insanity and prove his insanity by a preponderance of the evidence. C.Cr.P. art. 652; State v. Roy, 395 So.2d 664 (La. 1981). Legal insanity in Louisiana means that a defendant has a mental disease or defect which prevents him from distinguishing right from wrong with reference to the conduct which forms the basis for the criminal charge against him. R.S. 14:14. The determination of sanity is a factual matter reserved to the jury or other fact finder. Therefore, this Court traditionally did not review the rejection of an insanity defense where there was "some evidence" supporting the finding that defendant was not insane, because the Court is limited by the Constitution to review of questions of law. La. Const. of 1974, Art. 5, § 5(C).
Recently, however, the United States Supreme Court decided Moore v. Duckworth, 443 U.S. 713, 99 S.Ct. 3088, 61 L.Ed.2d 865 (1979), and rejected the "no evidence" standard of review when a state prisoner asserts a habeas corpus claim that the state convicted him with insufficient evidence after he entered a plea of not guilty by reason of insanity. According to the United States Supreme Court the proper standard for reviewing the conviction is that of Jackson v. Virginia, *31 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Following the dictates of Moore, this Court decided State v. Roy, supra, in which we adopted the Jackson standard of review when a defendant pleads the affirmative defense of insanity and claims that the record evidence does not support a finding of guilty beyond a reasonable doubt. Using the Jackson standard we must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence in the light most favorable to the prosecution, could conclude that defendant had not proved by a preponderance of the evidence that he was insane at the time of the offense.
2 In Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), the United States Supreme Court upheld the constitutionality of a similar presumption against a due process attack.
Id. at 772.
Additionally, the reviewing court properly looks to the expert and lay testimony and to the defendant's actions, for the fact finder's decision comprehends all these components of the case. State v. Heath, 447 So.2d 570, 575 (La.App. 1st Cir.1984), writ denied, 448 So.2d 1302 (La.1984). Factors pertinent to a review of expert testimony are wide-ranging. As revealed in prior cases grappling with this topic, they include whether lay testimony controverting the expert opinion was offered (State v. Claibon, supra, at 774; State v. Roy, supra, at 669), whether the experts specifically concluded that the defendant could not discern between right and wrong at the time of the crime State v. Noble, 425 So.2d 734, 737 (La.1983); State v. Claibon, supra), to what extent the expert testimony was premised on the self-serving revelations of the defendant (State v. Parker, 416 So.2d 545, 551 (La.1982)), to what extent the expert analysis is controverted by other expert analysis (State v. Heath, supra, at 576), the duration of the expert's contact with the defendant and whether he had interviewed the defendant previous to the offense (State v. Guidry, 450 So.2d 50, 52 (La.App. 3d Cir.1984), writ denied, 476 So.2d 344 (La.1985)), the chronological proximity of the expert examination to the offense (State v. Nealy, 450 So.2d 634, 639 (La.1984)), and whether the experts were treating physicians (Id.). Insofar as the defendant's actions, such factors as whether the defendant fled, disposed of evidence, and deliberately planned and executed the offense are pertinent. State v. Pravata, 522 So.2d 606, 613-14 (La.App. 1st Cir. 1988), writ denied, 531 So.2d 261 (La.1988).
Here, the expert testimony of Dr. Arneson, who opined the defendant was sane; was equivocal in that she never diagnosed the defendant, had only limited contact with the defendant for the purpose of assessing competency, and, in part, contradicted her prior finding that the defendant was probably insane at the time of the offense. Dr. Arneson, moreover, admitted that she made little effort to evaluate the defendant in the context of circumstances beyond those presented at the interview situation. Finally, the defendant was undergoing drug therapy at the time of his incarcerationand, ergo, Arneson's interviewsuch that his situation may well have altered from that of the day of the shooting.
Dr. Richoux, on the other hand, found the defendant insane, basing his conclusion on extensive interviews taken while he was the defendant's treating physician. This treatment, moreover, began in 1985, before the offense at issue. Richoux is wellversed in the defendant's medical history and observes he responds well to drug treatment. He disagrees with Arneson that the defendant was a malingerer.
Dr. Cox apparently examined the defendant only once, some nine months after the offense. Based on records, he concluded the defendant was insane, adding that the records were extensive. He submits the defendant received the wrong form of medication for his condition and had been getting gradually worse for about a month prior to the shooting. These conclusions are heavily dependent on Cox' reading of the records, however extensive. Cross-examination revealed that Cox was well-read in psychiatric matters.
*32 Dr. Mitchell, a psychiatrist who saw the defendant as a treating physician the morning of the shooting, concluded the defendant could tell right from wrong the day of the incident. He had seen him only once before (some six months previously) and, having been interrupted while in conference with two medical students, did not do a full interview with the defendant on August 21 but only spoke with him three or four minutes. Mitchell recorded that the defendant was "hostile, belligerent and demanding," but he obeyed Mitchell's directive to sit down and await his medication.
Apart from Arneson's and Mitchell's opinions, the State relies on informed lay opinionsthat of the nurse and of the Mental Health Center workerpremised on limited interactions not directly involving any manifestation of a sense of right and wrong.
Finally, as to the defendant's actions themselves, the circumstances revealed of record disclose neither plan nor method. It is uncontradicted that the defendant had been behaving most peculiarly for at least a time preceding the incident and that his offense is notable for not making a great deal of sense on the whole. The defendant shot the victim for no apparent reason and then waited around and confronted the police for no apparent reason, having little care for even his own safety. Likewise, the defendant's setting fire to his parents' home just prior to the shooting and then chasing his nephew down the street, firing shots, are uncontradicted and unexplained in any rational context.
The defendant's troubles, moreover, are grounded in an historical context of psychological difficulties stretching back to 1982 and resulting in several hospitalizations and ongoing drug therapy. This is not a case where a seemingly rational person committed an offense and then claimed a loss of his mental faculties. What we discern here is a person who has a chronic paranoid schizophrenic disorder tied together with an anti-social personality. Ergo, the question is whether the defendant in this troubled state could distinguish right from wrong at the time of the offense. Some experts said yes and others said no. Importantly, the defendant's treating physician, based on an encounter on the morning of the incident, albeit brief, opined that the defendant was sane. Finally, the activities and actions of the defendant immediately prior, during, and after the actual offense are not conclusive one way or the other.
Considering the totality of the record evidence in the light most favorable to the prosecution, we determine that a rational trier of fact (the jury) could have found that the defendant did not prove his insanity by a preponderance of the evidence. Therefore, this assignment lacks merit.
ASSIGNMENT NO. 2
This is a Batson review. In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 1716, 90 L.Ed.2d 69 (1986), the United States Supreme Court reaffirmed the principle that "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." (Citation omitted.) The court then set forth a three-part test to determine whether the defendant has made a prima facie showing that he has been denied equal protection, observing:
To establish such a case, the defendant first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary *33 inference of purposeful discrimination.
Batson, 106 S.Ct. at 1723 (citations omitted).
If "the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." Batson, 106 S.Ct. at 1723. The State's explanation "need not rise to the level justifying exercise of a challenge for cause." Id. However, "the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumptionor his intuitive judgmentthat they would be partial to the defendant because of their shared race." Id.
Once the State has given "an initial explanation related to the particular case to be tried," then the trial court must determine whether the defendant has established purposeful discrimination. The United States Supreme Court, however, did not set forth the particular procedures to be followed upon a defendant's timely objection to a State's challenge.
In State v. Williams, 524 So.2d 746 (La. 1988), the Louisiana Supreme Court held that the proper time for the trial court to rule on defendant's motion alleging that the State's use of a peremptory challenge was based on race was at the time that the motion contesting the challenge was made, not after trial. In Williams, the Louisiana Supreme Court stated
The Court in Batson left open the method and the time for ruling on such objections, but it is clear from the suggestions in the opinion and from principles of judicial efficiency that the ruling must be made at a time when the trial judge can correct the error of which the objections complain. The Batson decision suggested that the trial judge, if the objections are well founded, can correct the error either by denying the peremptory challenge and reinstating the challenged jurors or by dismissing the venire and selecting a new jury. This suggestion indicates that the ruling on the objections must be made at some time before the completion of the jury panel. Such a procedure avoids a reversal of the conviction, which is the only relief available if the ruling on the objections is postponed until post-conviction proceedings.
Id. at 746-47 (footnote omitted).
The standards set forth in Batson, supra were held to apply retroactively to all cases pending on direct review or not yet final by the United States Supreme Court in Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).
Here, the record reflects the defendant is black, a member of a cognizable race group. The record further shows the prosecution used three of its peremptory challenges to exclude blacks from the jury. Therefore, it might be argued that the defendant, by showing that he is black and that the State used its peremptory challenges to exclude three black persons from the jury, made a prima facie showing of purposeful discrimination in the selection of a jury. However, whether or not this proof was sufficient to establish purposeful discrimination, the State appears to have successfully met its burden of showing racially neutral reasons for the excusals.
The record indicates that the defendant and at least one member of the 12-person jury were black. During the jury selection, the State used only nine of its available 12 peremptory challenges. Three of these challenges were used to exclude black persons, Doris Anthony, Michael Hardin, and Lonnie St. Junior, from the jury. Both oral reasons given during breaks in the jury selection process and the written reasons, submitted by the prosecutor as part of the record, indicate that the State had neutral reasons, aside from race, for peremptorily challenging each of the three prospective black jurors. Doris Anthony was excused because she had worked for the past ten years with retarded children, some of whom were under psychiatric care and treatment. Since psychiatric testimony was to be at issue, the prosecutor did not feel that Ms. Anthony could adjudicate the case fairly. In his written reasons for excusal, the prosecutor also noted that Doris *34 Anthony looked bored and uninterested in the proceedings.
As to the other two black prospective jurors, Mr. Hardin was challenged because he had a prior conviction that he failed to acknowledge during voir dire questioning. A white prospective juror was challenged for the same reason, the State's oral argument indicates. The other black prospective juror, Mr. St. Junior, was challenged because his mother was receiving mental health treatment. In oral argument, the State indicated that a white prospective juror was likewise peremptorily challenged because of "previous experience with mental health."
Our review reveals that the State, in exercising the peremptory challenges placed at issue, was concerned with either the honesty of the prospective jurors or with priorand potentially prejudicialexposure to mental health topics. The defense in no manner rebutted the explanations submitted by the State.
Accordingly, we find the State established race-neutral reasons for peremptorily challenging all three prospective jurors. Moreover, at least one jury member was black and the State had several unused peremptory challenges which it could have used on this black juror had discrimination been its purpose. Ergo, we cannot say the State exercised its peremptory challenges for an unconstitutional purpose. Accordingly, this assignment lacks merit.
ASSIGNMENT NO. 3
After a careful review of the record in its entirety, we cannot find any error patent.
Finally, numerous assignments of error have been raised, which are not argued in brief nor in oral argument. Accordingly, under Rule 2-12.4 we deem them abandoned.
For the reasons assigned, the conviction and sentence are affirmed.
AFFIRMED.