683 So.2d 1378 (1996)
STATE of Louisiana
v.
Terrence MEYERS, Glenn Davis, Larry Delmore.
Nos. 95-KA-750, 96-KA-35 and 96-KA-395.
Court of Appeal of Louisiana, Fifth Circuit.
November 26, 1996.
Rehearing Denied December 17, 1996.
*1380 Jack M. Capella, District Attorney, Terry M. Boudreaux, Louise Korns, 24th Judicial District Court, Parish of Jefferson, Gretna, for Plaintiff-Appellee.
Anderson Council, New Orleans, Milton P. Masinter, Metairie, Thomas M. Calogero, New Orleans, for Defendants-Appellants.
Before GAUDIN, C.J., and DUFRESNE and GOTHARD, JJ.
DUFRESNE, Judge.

STATEMENT OF THE CASE
The defendants, Terrance Meyers, Glenn F. Davis and Larry Delmore, were indicted by the Jefferson Parish grand jury on October 15, 1992 for the first degree murder of Samuel George. When arraigned on October 22, 1992, the defendants entered pleas of not guilty. On February 5, 1993, the trial court denied the defendants' motion to suppress identification, and after conducting an in camera inspection of the State's files on February 19, 1993, the trial court found no Brady material.
Additionally, because the defendants were represented by the same attorney, the trial court conducted a Garcia hearing on February 19, 1993, and the defendants waived their right to conflict-free assistance of counsel. On March 30, 1993, the State filed a motion to remove counsel of record based upon conflict of interest stating that it was prepared to discuss "lesser charges" with the two defendants who did not fire the weapon. At a hearing on the State's motion to remove defense counsel held on April 1, 1993, the trial court appointed different attorneys for each defendant in order to advise them of their right to conflict-free assistance of counsel, and the court recessed the matter until April 8, 1993. When the hearing resumed on that date, the appointed attorneys stated that each defendant was knowingly and voluntarily waiving the right to conflict-free assistance of counsel. The trial court then denied the motion thereby allowing the defendants to proceed to trial represented by the same attorney.
On June 28, 1993, the State amended the indictment to reduce the charge to second *1381 degree murder. The defendants proceeded to trial on June 29, 1993, but the trial court declared a mistrial later that day. On June 30, 1993, the defendants again proceeded to trial, and at the conclusion of the three-day trial, the jury returned with a verdict of guilty as charged as to each defendant.
The defendants filed a motion for a new trial on July 22, 1993, and the motion was set for a hearing on July 28, 1993. On that date, separate attorneys enrolled as counsel of record for Delmore and Davis, and they both adopted the previously filed motion for a new trial. The trial court then continued the hearing on the motion. On August 16, 1993, the trial court again continued the hearing on the motion, and reset the hearing for September 10, 1993. Prior to that date, the defendants jointly filed a motion to continue the hearing. At the hearing on September 10, 1993, the defendants jointly filed a hand-written amended motion for a new trial alleging that they had discovered new witnesses who would give testimony exculpating the defendants and they requested that a new date be set for the hearing. The trial court refused to continue the hearing and the court subsequently denied the motion for a new trial. Thereafter, on September 13, 1993, the trial court sentenced defendants to life imprisonment without benefit of parole, probation or suspension of sentence.
Subsequently, Meyers filed a timely motion for appeal which was subsequently granted. On May 25, 1995, Davis filed an application for post conviction relief seeking reinstatement of his right to an appeal, and on September 29, 1995 the trial court granted him an out-of-time appeal. On February 27, 1996, this Court remanded Meyers' appeal to district court for supplementation of the record. On April 29, 1996, Delmore filed a motion for an out-of-time appeal and the trial court granted it on May 1, 1996. On May 3, 1996, the State filed a motion to consolidate the three appeals and this Court subsequently granted the motion.

FACTS
On the evening of August 3, 1992 between 9:00 and 9:30 P.M., Norman Jackson and Samuel George were sitting on the rear bumper of a truck which was parked near the corner of East Claiborne and Cabildo in the Claiborne Gardens area of Westwego, Louisiana. George, who was a "good friend" of Jackson, offered him some cocaine and Jackson, a long-time user of the drug, had "one hit." After George also smoked some of the drug, he left the area. When George later returned around 10:00 P.M., Jackson was still sitting on the truck's bumper. According to Jackson, George then stood on the corner in order to sell cocaine.
Subsequently, Jackson observed a two-door Oldsmobile Cutlass occupied by three males approaching the intersection of East Claiborne and Cabildo. When the orange prime colored Cutlass passed underneath a street light, Jackson was able to identify the driver as Meyers, the front seat passenger as Larry Delmore and the rear seat passenger as Glenn Davis. The Cutlass stopped by the corner of East Claiborne and Cabildo where George and Jackson were located and at that time Jackson noted that Davis, the rear seat passenger, "stuck his head ... to the window." Delmore asked George "did he have anything," and George replied "yeah" and walked toward the Cutlass. When George "got right up on" the Cutlass, Delmore fired three shots at him and George, who was struck in the chest and arm, fell in the grass nearby. According to Jackson, the Cutlass then "pulled off like they ain't never did nothing." Jackson fled the scene by running behind a residence, and he heard a fourth shot as the Cutlass proceeded down Cabildo.
Darren Bradley, who was in the vicinity of the corner of East Claiborne and Cabildo, ran to George who had been fatally wounded. Bradley had also observed the approach of the Cutlass and the firing of the shots; however, from his "vantage point," he was unable to identify the occupants of the Cutlass nor did he see Jackson at the scene at the time of the murder.
Subsequently, Jackson returned to the scene and in about 20 to 25 minutes the police arrived. Jackson, who appeared "very scared," talked to the Detective Saks describing what he had observed; and he provided a description of the Cutlass and the defendants. However, he did not identify the *1382 defendants, whom he had known for some time, as the perpetrators at that time because he was "scared."
An autopsy of George revealed that he died of a gunshot wound to the chest which perforated the lung and heart, and at the time of his death he had both cocaine and alcohol in his system.
On August 11, 1992 Detective Thurmond presented two photographic line-ups to Jackson, one containing the photograph of Meyers and the other containing the photograph of Delmore. At that time Jackson did not identify them as the perpetrators because he "still didn't want to get involved with it." However, when Detective Thurmond again presented the same two photographic line-ups to Jackson on August 13, 1992, he identified Meyers as the driver and Delmore as the front seat passenger who fired the gun. Thereafter, the following day, Detective Thurmond presented a third photographic line-up to Jackson and he identified Davis as the rear seat passenger.

MEYERS' ASSIGNMENT OF ERROR NUMBER ONE
The court committed reversible error in denying the defendant's motion for new trial, in that the verdict was contrary to the law and the evidence.

DELMORE'S ASSIGNMENT OF ERROR NUMBER ONE
The trial and jury erred in determining that the appellant was guilty of LSA-R.S. 14:30.1 in that the evidence was constitutionally insufficient to have found the defendant guilty beyond a reasonable doubt, specifically, the state failed to negate any reasonable probability of misidentification.

DAVIS' ASSIGNMENT OF ERROR
Insufficient evidence exists to convict Glenn Davis of being a principal to this murder.

DISCUSSION
In these assignments, the defendants challenge the sufficiency of the evidence. Specifically, Meyers and Davis argue that the evidence failed to prove that they each had the requisite specific intent to kill or to inflict great bodily harm while Delmore argues that the evidence failed to prove the identity element of the offense.
In evaluating the sufficiency of the evidence, the standard to be used by the appellate court is whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have been found the defendant guilty beyond a reasonable doubt of every element of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305 (La. 1988).
LSA-R.S. 14:30.1 provided in pertinent part:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm....
Additionally, LSA-R.S. 14:24 provided:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
However, under LSA-R.S. art. 14:24, not all principals are automatically guilty of the same grade of offense. One who aids and abets in the commission of a crime may be charged and convicted with a higher or lower degree of the crime, depending upon the mental element proved at trial. Thus, an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. State v. Brooks, 505 So.2d 714 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987), rehearing denied, 484 U.S. 1021, 108 S.Ct. 737, 98 L.Ed.2d 684 (1988). It is not enough to find merely that his accomplice had the necessary mental state, since this intent cannot be imputed to the accused. State v. Holmes, 388 So.2d 722 (La.1980).
Thus in order to support a conviction as a principal to second degree murder, the State must show that the defendants had *1383 specific intent to kill or to inflict great bodily harm. See State v. Francis, 486 So.2d 346 (La.App. 3rd Cir.1986), writ denied, 492 So.2d 1216 (La.1986).
Specific intent is: "that state of mind which exist when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Since specific intent is a state of mind, it need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of the defendant. See State v. Graham, 420 So.2d 1126 (La.1982).
When circumstantial evidence is used to show specific intent, LSA-R.S. 15:438 should be considered as it provides a rule regarding the use of such evidence. The rule directs the fact finder, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove, and then to convict only if every reasonable hypothesis of innocence is excluded. State v. Lilly, 468 So.2d 1154 (La.1985).
The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of the correctness of this determination is to be guided by the Jackson standard. State v. Huizar, 414 So.2d 741 (La.1982).
In support of their contention that they lacked the requisite criminal intent, Meyers and Davis assert that the evidence only established that the former was the driver of the Cutlass and that the latter was a passenger and that such evidence does not support a finding of specific intent to kill or to inflict great bodily harm.
In State v. Smith, 26,661 (La.App.2d Cir. 3/1/95), 651 So.2d 890, writ denied, 95-0918 (La.9/15/95), 660 So.2d 458, a case involving the offenses of second degree murder and attempted second degree murder resulting from a drive-by shooting, the co-defendant Gibson, who was the driver of one of the three cars that participated in the shooting, argued that he lacked the requisite criminal intent.
Prior to the shooting, Gibson was present at a party in a field when a statement regarding a drive-by shooting on South 4th Street was made. A large group of people in about eight cars then left the field and drove down South 4th Street and Gibson was driving one of the cars. However, no shooting occurred at that time and the group later returned to the field. Subsequently, three cars left the field and Gibson was again driving one of the cars. Co-defendant Smith was sitting in the front passenger seat of Gibson's car while Harris, Daniels, Bradford and Davis were sitting in the rear seat. Gibson drove to his residence and a female identified as his girlfriend exited the car. Gibson then drove to the corner of South 4th Street where other cars lined up behind him. Someone from another car instructed Gibson to turn his lights off, and after he had done so he slowly drove down South 4th Street. Just prior to the shooting, Harris, who was sitting in the middle of the rear seat, saw co-defendant Smith with a gun and Davis, another rear seat passenger, was also able to see the gun in defendant Smith's hand laying in his lap. Following the shooting, Gibson drove away at a faster rate of speed, and according to Harris, Gibson made no statement after the shooting as if he was surprised by the incident.
In finding the evidence sufficient to convict Gibson, the Court stated the following:
... The state proved that Gibson had the specific intent to kill or inflict great bodily harm as well as the requisite knowledge. Finally, this evidence was also sufficient to eliminate any reasonable hypothesis of innocence. First, Gibson was seen at the party in the field along with the other defendants and drove a car down South 4th Street one time previously before driving back for the shooting. Second, upon arriving at the corner of South 4th Street, Gibson assumed the role of the lead vehicle. Third, when instructed by someone in another car to turn off his lights, he readily complied. Fourth, witness Harris was able to see from the back seat that defendant Smith had a gun. It was reasonable for the jury to conclude that if Harris could see the gun from the back seat, then Gibson could also see it from where he was sitting in the front seat next to Smith. Finally, according to Harris, Gibson made *1384 no statement after the shooting as if he was surprised by the incident.
Thus, as the state contends, the jury could conclude that Gibson aided and abetted in the commission of the crime by giving his co-perpetrators the opportunity to kill or inflict great bodily harm. He drove to the crime scene, even if it was under the instruction of someone else, where he had already been once that evening. He stopped at the corner and turned off his lights. Passengers in Gibson's car had guns and fired shots at people outside of the house. This assignment is without merit.
State v. Smith, 651 So.2d at 900.
In the present case, neither Meyers nor Davis tried to assist the victim, George, after the shooting. They did not call the police to report the shooting or give any statement regarding the murder to anyone. Meyers drove the Cutlass to the scene and Davis watched the incident thru the car window. Although there was no direct evidence presented that either Meyers or Davis knew Delmar was armed, it can easily be assumed that the jury believed that all three knew exactly what their purpose was in confronting George on the street that night. This was a drive-by shooting quite common in the lives of drug dealers and the participants here all knew that Delmar intended to shoot Samuel George. They were definitely not an innocent driver and passenger in the car.
Further, the trial judge who heard all of the testimony and evidence stated for the record in denying the motion for a new trial that the verdict of second degree murder was just. Accordingly, Meyers and Davis were principals in the crime of second degree murder.
Regarding Delmore's claim that the evidence failed to prove the identity element, it is noted that the State must prove the identity of the perpetrator in proving the elements of the offense. State v. Bovie, 95-474 (La.App. 5th Cir. 11/28/95), 665 So.2d 558. Employing the Jackson standard to the identity element of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Spencer, 93-571 (La.App. 5th Cir. 1/25/94), 631 So.2d 1363, writ denied, 94-0488 (La.2/3/95), 649 So.2d 400.
At trial Jackson positively identified Delmore as the perpetrator who fired the shots at George. However, Delmore argues that Jackson's testimony was insufficient to prove the identity element stating the following:
Norman Jackson, at least an admitted four time convicted felon, was indisputably impaired on crack cocaine at the time of the incident. Interestingly, although Mr. Jackson insists that he was present at the time of the shooting, a more credible witness, Darren Bradley, who observed the vehicle come up the street, but was unable to identify its occupants, stated on the record that he did not see Norman Jackson at the scene. Mr. Jackson initially gave a taped statement on August 3, 1992, claiming no knowledge of the occupants of the vehicle from where the gunshots rang out slaying Mr. George. On August 11, 1992, when Mr. Jackson had the opportunity to view three separate photo arrays containing the alleged perpetrators he was unable to identify the appellant [Delmore] as one of the offenders. Only, after a second visit by the police officers and ten days after the incident, did Mr. Jackson now come forward and finger the appellant [Delmore] as the trigger man in the incident.
The jury heard the entire testimony of Jackson as well as the testimony of the other witnesses including Bradley. After hearing this evidence, the jury chose to believe Jackson's testimony identifying Delmore as the perpetrator who fired the shots at George. It is the jury's function to determine the weight of the evidence bearing on the defendant's identification and it is not the reviewing court's function to re-evaluate the credibility choices and factual findings made by the jury. State v. Spencer, supra. Viewing the evidence in the light most favorable to the prosecution and recognizing the State's burden to negate any reasonable probability of misidentification, a rational trier of fact could have found beyond a reasonable *1385 doubt that Delmore committed the second degree murder of George.
These assignments of Meyers, Davis and Delmore are without merit.

MEYERS' ASSIGNMENT OF ERROR NUMBER TWO
The court committed prejudicial error in denying the defendant's motion to suppress the photographic line-up identification.

MEYERS' ASSIGNMENT OF ERROR NUMBER THREE
The court committed prejudicial error in denying the defendant the right to question the State's only witness to the photographic line-up, relative to his ability to see the incident, his attentiveness, the conditions, the length of time he observed the incident and his ability to describe the perpetrators at the time of the incident.

DELMORE'S ASSIGNMENT OF ERROR NUMBER TWO
The trial court erred in denying the defendant's motion to suppress the photographic identification of the appellant.

DISCUSSION
In these assignments, Meyers and Delmore contend that the trial court erred in denying the motion to suppress identification. Additionally, Meyers contends that the trial court erred in refusing to allow him to question Norman Jackson at the suppression hearing relative to his ability to observe the homicide, his attentiveness, the accuracy of his description, the length of time of the occurrence and his degree of certainty.
At the motion suppression hearing, the State presented the testimony of Detective Thurmond and Norman Jackson.
Detective Thurmond testified that on August 11, 1992 he presented to Jackson two sets of photographic line-ups, one containing the photograph of Delmore and the other containing the photograph of Meyers. Although Jackson stated that he did not recognize anyone in either line-up, Detective Thurmond noted that it appeared that Jackson "was afraid and some what reluctant to get involved as a witness for fear of retaliation or what not and ... was withholding some information." Detective Thurmond informed Jackson that he would "give" him some time to think about it and that he would return on a later date. On August 13, 1992, two days later, Detective Thurmond again presented the same two photographic lineups to Jackson and this time Jackson positively identified Meyers and Delmore.
On cross-examination, Detective Thurmond testified that he talked to Jackson briefly at the scene of the murder, but Jackson did not identify anyone. Detective Thurmond noted that Jackson knew several of the individuals pictured in the line-ups. Detective Thurmond stated that he informed Jackson that "if he received any threats in regards to coming forward [and identifying someone]" to contact him so that he "could then act on that to protect him ..." After Jackson eventually identified Meyers and Delmore, he advised Detective Thurmond that he didn't "come forward" earlier because he was afraid that the Meyers and Delmore would kill him or have him killed.
Norman Jackson testified that on August 13, 1992 Detective Thurmond showed him two photographic line-ups and he identified Meyers and Delmore. When Detective Thurmond had previously shown him those line-ups, he did not make any identifications because he was afraid and did not want to "be involved."
On cross-examination, Jackson testified that he was in close proximity to the Cutlass, that the murder occurred at approximately 10:30 P.M. and that the area was lit by street lights. Jackson stated that on the night of the murder he did not advise the police that he could identify the perpetrators. When asked whether he had given a prior description of the perpetrators, the prosecutor objected and the trial court sustained the objection. The prosecutor again objected when Jackson was questioned about the duration of the murder and the trial court sustained the objection.
Additionally, Jackson testified at trial to the facts surrounding the murder and he noted that he "got a good look" at the defendants whom he had known for some time. He admitted that he had "one hit" of crack cocaine about ½ hour prior to the murder, but *1386 stated: "... it don't affect me cause my body so immune to it. One hit ain't going to do nothing." He also noted that he had provided a description of the defendants to the police.
A defendant who seeks to suppress an identification must prove that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. State v. Lowenfield, 495 So.2d 1245 (La. 1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986), rehearing denied, 478 U.S. 1032, 107 S.Ct. 13, 92 L.Ed.2d 768 (1986); State v. Barnes, 592 So.2d 1352 (La.App. 5th Cir.1991).
When there is a suggestive identification procedure, courts must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentification. These factors were initially set out in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and approved in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). They include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. State v. Martin, 595 So.2d 592 (La. 1992).
Even assuming that both identification procedures involving Meyers and Delmore were suggestive, the application of the Manson factors leads to the conclusion that there was no substantial likelihood of misidentification.
Jackson had ample opportunity to view the defendants during the commission of the murder. They stopped their car at the corner of an intersection which was lit by street light and within close proximity of Jackson. They then remained stopped at that corner waiting for George to approach their car and they did not depart until Delmore fired three shots at George.
Jackson apparently paid close attention to the defendants considering that he stated that he "got a good look" at them whom he had previously known for some time. Furthermore, Jackson was not affected by the "hit" of crack cocaine which he had about ½ hour earlier due to his long-term use of the substance.
Jackson did give descriptions of the defendants, but there is no indication in the record regarding the accuracy of those descriptions.
Jackson did not identify either Meyers or Delmore at the photographic line-ups on August 11, 1992 because he was afraid; however, two days later Jackson identified both of them. Additionally, the level of certainty demonstrated at each of those identifications was high in that Jackson positively identified them as two of the perpetrators.
Finally, considering that the identifications occurred within ten days of the murder, the amount of time which elapsed between the murder and the identifications was nominal.
Considering the totality of the circumstances, it appears that both photographic identifications, even if suggestive, nonetheless produced reliable identifications. Therefore, the trial court did not err in denying the motion to suppress identification.
Furthermore, regarding Meyers' contention that the trial court erred in limiting his cross-examination of Jackson at the suppression hearing, it is noted that the trial court only refused to allow defense counsel to question Jackson concerning the duration of the murder and his prior description of the perpetrators; however, that refusal did not prejudice the defendant. At trial Jackson testified to the facts immediately preceding the murder, and although he did not indicate the duration of the murder, his testimony showed that he had ample opportunity to view the defendants during the commission of the murder thereby establishing the first Manson factor. Jackson also testified at trial that he had provided descriptions of the defendants, and despite the absence of any evidence regarding the accuracy of those descriptions, the application of the four other *1387 Manson factors showed that there was no substantial likelihood of misidentification.
These assignments are without merit.

MEYERS ASSIGNMENT OF ERROR NUMBER FOUR
The court committed prejudicial error in denying the defendant's discovery request for the statements of eye witnesses who failed or refused to identify the defendant [Meyers] as a perpetrator.

MEYERS ASSIGNMENT OF ERROR NUMBER FIVE
The court committed prejudicial error in denying the defendant's discovery request for the complete initial police report.

DISCUSSION
In these assignments, Meyers contends that the trial court erred in denying his discovery request for the statements of "on scene witnesses." Specifically, Meyers argues that those statements should have been included in the initial police report.
In response to the Meyer's discovery request, the State provided the initial police report prepared by Officer West, a "synopsis prepared by Detective Gray Thurmond of the homicide division" and the defendants' arrest warrants along with their supporting affidavits; the affidavits which were prepared by Detective Thurmond stated that the detectives who subsequently arrived on the scene obtained several statements from witnesses before departing.
At a pre-trial hearing held on February 19, 1993, the trial court conducted an in camera inspection of "all of the materials, police reports, various statements and so forth" and the trial court found no Brady material and refused to allow discovery of any statements.
LSA-R.S. 44:3(A)(4) sets forth exactly what a defendant is entitled to obtain in the way of police reports. It provides in pertinent part:
A. Nothing in this Chapter shall be construed to require disclosures of records, or the information contained therein, held by the offices of the attorney general, district attorneys, sheriffs, police departments, Department of Public Safety and Corrections, marshals, investigators, public health investigators, correctional agencies, communications districts or intelligence agencies of the state, which records are:
* * * * * *
(4)(a) The records of the arrest of a person, other than the report of the officer or officers investigating a complaint, until a final judgment of conviction or the acceptance of a plea of guilty by a court of competent jurisdiction. However, the initial report of the officer or officers investigating a complaint, but not to apply to any follow up or subsequent report or investigation, records of the booking of a person as provided in Louisiana Code of Criminal Procedure Article 228, records of the issuance of a summons or citation, and records of the filing of a bill of information shall be a public record.
(b) The initial report shall set forth:
(i) A narrative description of the alleged offense.
(ii) The name and identification of each person charged with or arrested for the alleged offense.
(iii) The time and date of the alleged offense.
(iv) The location of the alleged offense.
(v) The property involved.
(vi) The vehicles involved.
(vii) The names of investigating officers.
(Emphasis added)
Thus under LSA-R.S. 44:3(A)(4), the defendant was only entitled to the initial report made by the officer handling the complaint and such report only needed to contain those items listed in the statute. State v. Walters, 582 So.2d 317 (La.App. 4th Cir.1991), writ denied, 584 So.2d 1171 (La.1991).
Considering that the statute does not require that the initial report contain statements made at the scene by witnesses, the trial court did not err in refusing to allow discovery of the statements of the "on scene witnesses."
This assignment is without merit.

*1388 MEYERS' ASSIGNMENT OF ERROR NUMBER SIX

The Court committed reversible error in allowing the minute clerk to tell the jury that the State amended capital indictment was returned by the Grand Jury as a true bill.

DISCUSSION
This assignment of error was not briefed on appeal and therefore it is considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4; State v. Jackson, 548 So.2d 29 (La.App. 5th Cir.1989).

MEYERS' ASSIGNMENT OF ERROR NUMBER SEVEN
The Court committed patent reversible error when it gave improper jury instructions as to the necessary proof of specific intent as to each defendant.

DISCUSSION
Meyers contends that the trial court improperly charged the jury regarding the requisite specific intent as to each defendant. However, a review of the record shows that defense counsel failed to raise a contemporaneous objection to the jury charge. A defendant's failure to object to an allegedly erroneous jury charge precludes appellate review of the alleged error. LSA-C.Cr.P. art. 801, 841; State v. Wilson, 93-617 (La.App. 5th Cir. 1/25/94), 631 So.2d 1213, writ denied, 94-0476 (La.11/4/94), 644 So.2d 1046.
This assignment is without merit.

DELMORE'S ASSIGNMENT OF ERROR NUMBER THREE
The trial court erred in denying the defendant's motion for a new trial and failing to grant a continuance in order that exculpatory witnesses could be presented at the motion for a new trial.

DISCUSSION
Delmore contends that the trial court abused its discretion in refusing to continue the hearing on the motion for a new trial. Delmore and the other defendants sought the continuance in order to present the testimony of exculpatory witnesses who had just recently been discovered.
LSA-C.Cr.P. art. 709 sets forth the requirements for a motion for a continuance based upon the absence of a witness. These requirements are:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial [or in this case hearing on the motion for a new trial] is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
The decision to grant a continuance is placed in the discretion of the trial court and will not be disturbed absent an abuse of discretion. State v. Washington, 407 So.2d 1138 (La.1981).
At the hearing on the motion for a new trial, Delmore's defense counsel, speaking on behalf of all three defendants, stated the following:
... we come into court at this time and advise the court that one, a certain witness named Gabrielle Harris has been discovered recently by the defense and we believe she can give testimony exculpating the three defendants. The perpetrators of the offense have, in fact, confessed to her that they killed Samuel George and that the three defendants are not guilty.
Two, a certain individual named Charlene Carter an eye witness to the murder has been identified by the defense and will testify that the three defendants did not kill the victim, Samuel George, and further, will testify as to the name of the actual perpetrators. There were two of those.
Three, the defense has a good faith belief that Sherrel Baily was also an eye witness to the murder of Samuel George and will testify that the three defendants were not guilty and will identify the actual perpetrators.
Subsequently, defense counsel noted that the three witnesses were discovered within the last two weeks.
Even assuming that the statement by defense counsel satisfied the requirement of LSA-C.Cr.P. art. 709(1), the requirements of *1389 LSA-C.Cr.P. art. 709(2) and LSA-C.Cr.P. art 709(3) were not met in that there was no showing of a probability that the witnesses would be available at the time to which the motion was deferred nor was there a showing of the exercise of due diligence in efforts to procure the attendance of the witnesses. Under these circumstances, it does not appear that the trial court abused its discretion in denying the motion for a continuance. See State v. Washington, supra.
This assignment is without merit.
We have reviewed the record for any errors patent and find none that would constitute reversible error.

DECREE
For the foregoing reasons, the conviction and sentence of Terrence Meyers, Glenn F. Davis and Larry Delmore are affirmed.
AFFIRMED.