.WALTER J. ROTHSCHILD, Judge.
On May 15, 2001, the Jefferson Parish District Attorney filed a petition alleging that Z.S., a juvenile, committed an attempted armed robbery in violation of LSA-R.S. 14:27:64. The juvenile denied the allegations in the petition on May 21, 2001. On June 28, 2001, an adjudication hearing was held before the juvenile court judge. After the presentation of the State’s case, counsel for the juvenile moved for a directed verdict, which was denied. At the conclusion of the hearing, the juvenile court judge adjudicated Z.S. delinquent of attempted first degree robbery.[1] The court conducted a disposition hearing on August 23, 2001 and committed the juvenile to the custody of the Department of Public Safety and Corrections, Office of Youth Development, for one year. On August 27, 2001, the juvenile filed a motion for appeal, which was granted.

FACTS

At the adjudication hearing, the victim, Adam Trahan, testified that when he got off of work on May 13, 2001, he went to a telephone booth on Pratt Street in Gretna to call someone to pick him up. While he was using the telephone, two black males came up to him and demanded money, which Mr. Trahan refused to give to them. They |sdemanded money again, and Mr. Trahan again refused. Mr. Trahan testified that one of the perpetrators pulled a gun on him and both of them asked him for money once again, but he refused to give it to them. One of the perpetrators hit Mr. Trahan on the side of the head with the gun. Then, the two males ran away toward the Westbank Expressway, and Mr. Trahan chased them for about two minutes until he spotted two police officers.
Mr. Trahan approached the police officers and told them that he had just been robbed, but that the perpetrators did not take anything. He testified that the two perpetrators were black and he gave the officers a description of them. However, he testified that he could not recall what they were wearing at that time. Upon further questioning, he stated that the perpetrators were wearing blue jeans, “I guess,” and white T-shirts. He also indicated that he probably told the officers that one of the suspects was 6 feet, 3 inches and the other one was 5 feet, 7 inches, but he was shaken up that night and did not know for certain. He was certain that he told the officers that the perpetrators were black males. One of the officers told Mr. Trahan to stay there for a while, and the officers went and picked up the two suspects.
Mr. Trahan testified that the officers brought two individuals to him in a squad car, and he positively identified them as the two males who had attempted to rob him. He indicated that he had gotten a good look at their faces at the time of the incident. At the adjudication hearing, Mr. Trahan identified Z.S. as one of the perpetrators. Although he could not recall which one of the perpetrators had hit him on the head or pointed the weapon at him, he identified the gun that was introduced at the adjudication hearing as the one that was pointed at him on the night of the attempted robbery. He did not realize until he was shown the gun before the hearing that the gun used during the inci *1005 dent was a water gun wrapped in black electrical tape.
Officer Corey Newby of the Gretna Police Department testified that on May 13, 2001, at approximately 10:30 or 11:00 p.m., he was approached by the victim in this case, Adam Trahan. Mr. Trahan advised Officer Newby that while he was using a pay phone at|42112 Pratt Street about five minutes earlier, two black males approached him and one of them brandished a black semi-automatic pistol and demanded his money. Mr. Trahan told Officer Newby that he did not give the men any money and that they “took off’ toward the Westbank Expressway. Officer Newby testified that Mr. Trahan told him that one of the perpetrators was tall and wore a black shirt and tan pants, and the other one was short and wore a gray shirt and gray pants. Officer Casey Knight, who was Officer Newby’s partner, testified that Mr. Trahan described the perpetrators as two black males, one who was about 5'7" and wearing gray pants and a gray shirt, and one who was about 6'3" and wearing a black shirt and tan pants. Mr. Trahan informed the officers that the incident had occurred about a block away from where he had approached the officers.
After receiving the information about the attempted robbery and the description of the perpetrators, Officers Newby and Knight started patrolling the area to see if they could locate the suspects. Officer Newby testified that he observed two black males fitting the description under the expressway, which was about two to three blocks from where Mr. Trahan had told them about the attempted robbery. Officer Newby testified that there was enough light for him to identify the males by the color of their skin, but not enough to identify the color of their clothing, at first. He stated that he first noticed the height difference in the males, that one was relatively tall and the other one was relatively short.[2]
Officers Newby and Knight approached both of the suspects and did pat down searches for safety reasons. While Officer Knight was patting down the shorter suspect, he discovered what appeared to be a gun. When the gun was put into the light, Officer Newby noticed that it was a water gun wrapped in electrical tape. Both of the suspects were placed in double-locked handcuffs, advised of their Miranda[3] rights, placed in the back of the patrol car, and taken to 2112 Pratt Street. When they arrived at 2112 Pratt ^Street, the victim was brought to the patrol car. After he observed both of the suspects, he positively identified them as the perpetrators. At the adjudication hearing, Officer Newby identified the water gun wrapped in electrical tape as the gun that was taken from one of the suspects. He stated that on the night of the incident, the gun looked like a black semi-automatic pistol.

LAW AND DISCUSSION

On appeal, the defendant asserts that the trial court erred in denying his motion for a directed verdict and in ruling that the totality of circumstances permit the identification by the victim. He also contends that the one-on-one identification of the suspects by the victim was suggestive.
At the end of the adjudication hearing, defense counsel moved for a directed verdict based on the discrepancy in the identification of the perpetrators, primarily because Mr. Trahan did not remember exactly what he told the officers and he indicated that the suspects were wearing white T-shirts and blue jeans. A directed verdict is inappropriate in criminal cases, but LSA-C.Cr.P. art. 778 provides that a *1006 motion for acquittal is available when a criminal case is tried before a judge. State v. Powell, 00-0484 (La.App. 4 Cir. 2/15/01), 779 So.2d 67, 73; State v. Brooks, 452 So.2d 149, 157 (La.1984). LSA-C.Cr.P. art. 778 provides, in pertinent part:
In a trial by the judge alone the court shall enter a judgment of acquittal .... after the close of the state’s evidence or of all the evidence, if the evidence is insufficient to sustain a conviction.
The trial judge denied the motion and stated in pertinent part:
At this time, based upon the totality of the circumstances, the evidence presented, the very quick time frame in which this entire incident happened, from the time that Mr. Trahan was approached at the phone booth until the time that the two suspects were apprehended by the police, which was approximately five minutes, according to the testimony of the police officers, the fact that there is clearly discrepancy between the testimony of Mr. Trahan today and the testimony of the police officers.... I frankly do think that Mr. Trahan perhaps does not remember what he told the police, in his state of confusion and nervousness at the time of what he believed to be an armed robbery. I found the testimony of both police officers to | fibe quite credible, in the way that the whole incident went down. There was clearly cooperation in the testimony, in that ... in where they all were when the incident took place, and where the police officers were, at the Sentry Motel when Mr. Trahan approached them. The fact that they immediately began looking for suspects that would meet the description they were told, at that time. They stopped the two suspects, including this defendant, Z.S., did a pat down which was perfectly reasonable and appropriate for the police officers to do. And sure enough, on the person of Z.S., was what appeared, at the time, to be a semiautomatic weapon ...
.... Mr. Trahan was quite clear in court today that the, that the, um, the identification that he made at the scene, minutes after the incident happened. He was positive about those two suspects, being this defendant and another defendant. And he was positive in court today. The police officers testified that he was positive in his identification at the scene, and unwavering. And I think again, the totality of the circumstances and the credibility of the witnesses, that there is sufficient evidence to convict the defendant of the crime of attempted first degree robbery.
In State v. Egana, 01-100 (La.App. 5 Cir. 7/30/01), 792 So.2d 931, this Court set forth the law regarding identification procedures:
A defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. State v. Prudholm, 446 So.2d 729, 738 (1984); State v. Payne, 00-1171 (La.App. 5 Cir. 12/13/00), 777 So.2d 555, 558-559. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). The factors to be considered in assessing reliability, as set out in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), are: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness’ degree of attention; 3) the accuracy of the prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and, 5) *1007 the time between the crime and the confrontation. See also, Manson v. Brathwaite, supra. In evaluating the defendant’s argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Clennon, 98-1370 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, 164. A trial court’s determination of the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. Id.
In evaluating a challenge to an identification procedure, courts must consider the totality of the circumstances to determine whether an identification presents a substantial likelihood of misidentification. Manson v. Brathwaite, 432 U.S. at 113, 97 S.Ct. at 2252; State v. Meyers, 95-750 (La.App. 5 Cir. 11/26/96), 683 So.2d 1378, 1386, writ denied, 97-0234 (La.6/20/97), 695 So.2d 1350. As a general rule, one-on-one identifications are not favored. However, under certain circumstances, these identifications are permissible. State v. Jackson, 96-661 (La.App. 5 Cir. 4/9/97), 694 So.2d 440, 447, writs denied, 97-1050 (La.10/13/97), 703 So.2d 609, 97-1255 (La.10/13/97), 703 So.2d 612. This is particularly true when the one-on-one identification is closely associated in time with the commission of the crime and where the suspect is returned to the location of the crime for immediate identification. State v. Robinson, 404 So.2d 907, 909 (La.1981). Such identifications promote fairness by assuring reliability and the prompt release of innocent suspects. Id.
In the present case, the defendant contends that the one-on-one identification was suggestive. However, we find that the one-on-one identification of the perpetrators by the victim was permissible, because the one-on-one identification was closely associated in time with the commission of the crime and the suspects were returned to the location of the crime for immediate identification.
There was a discrepancy between the testimony of Officers Newby and Knight and that of Mr. Trahan regarding the clothing worn by the perpetrators and whether Mr. Trahan told the officers the height of the perpetrators. Officer Newby testified at the adjudication hearing that Mr. Trahan told him the perpetrators were black males, that one was relatively tall and wore a black shirt and tan pants, and that the other one was relatively short and wore a gray shirt and gray pants. Officer Knight testified that Mr. Trahan told him the' perpetrators were black males, that one was 6 feet, 3 inches and wore a black shirt and tan pants, and that the other one was about 5 feet, 7 inches and wore a gray shirt and gray pants. However, Mr. Tra-han testified that he only recalled telling the officers that the perpetrators were black males. He stated that he did not tell the officers what the perpetrators were wearing, nor how tall they were, because he could not recall that information. He testified that he was “kind of shook up” and nervous that night | Rbecause someone had pointed a gun at him. Upon further questioning, Mr. Trahan stated that he “probably” told the officers that one of the individuals was 5 feet, 7 inches and the other one was 6 feet, 3 inches, but he was not certain. When questioned further about what the perpetrators were wearing, Mr. Trahan testified that it was dark out there with hardly any light. He then said that the perpetrators were wearing blue jeans, “I guess,” and white T-shirts.
The record reveals that on the night of the attempted robbery, the chain of events occurred very quickly. Mr. Trahan identified Z.S. and the other perpetrator shortly *1008 after the crime occurred and he testified that he had gotten a good look at their faces at the time of the incident. The officers testified similarly regarding the description of the perpetrators given to them by Mr. Trahan and regarding the events that occurred that evening. Although there was a discrepancy between the testimony of Officers Newby and Knight and that of Mr. Trahan, Mr. Tra-han testified that he was nervous that night because he was afraid of being shot and, therefore, it is reasonable to infer that he did not remember exactly what he told the police that night.
Considering the testimony and evidence in this matter, we find that the totality of the circumstances supports the identification of Z.S. Therefore, the juvenile court did not err in denying the motion for a directed verdict and in finding Z.S. delinquent of attempted first degree robbery. Accordingly, the defendant’s assignment of error is without merit.

ERROR PATENT DISCUSSION

In State in the Interest of C.D., 95-160 (La.App. 5 Cir. 6/28/95), 658 So.2d 39, 41, this Court noted that the Louisiana Children’s Code is silent as to whether a juvenile criminal proceeding is entitled to an error patent review on appeal. This Court further [3noted that according to LSA-Ch.C. art. 104, the Louisiana Code of Criminal Procedure governs in matters not provided for in the Children’s Code. Thus, the Court concluded that “we are mandated by LSA-C.Cr.P. art. 920 to conduct an error patent review despite the fact that defense counsel did not request it.” Id. Therefore, in the instant case, the record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). The review reveals two errors patent in this case.
First, the record is unclear as to whether the juvenile denied the allegations of the petition or the amended petition. The Children’s Code is silent as to the remedy in this situation. As stated above, this Court has noted that according to LSA-Ch.C. art. 104, the Louisiana Code of Criminal Procedure governs in matters not provided for in the Children’s Code. LSA-C.Cr.P. art. 555 provides that the failure to arraign the defendant or the fact that he did not plead is waived if the defendant enters upon trial without objecting thereto and that it shall be considered as if he had pled not guilty. Because the juvenile proceeded to the adjudication hearing without objection, any irregularity in the arraignment was waived.
Second, the trial judge did not inform the juvenile of the prescriptive period for seeking post-conviction relief as mandated by LSA-C.Cr.P. art. 930.8, which provides that a court shall not consider an application for post-conviction relief, including applications which seek an out-of-time appeal, if the application is filed more than two years after the judgment of the conviction and sentence become final.
In State v. In the Interest of W.T.B., 34,269 (La.App. 2 Cir. 10/20/00), 771 So.2d 807, 813, the Second Circuit instructed the trial court to advise the juvenile of the provisions of LSA-C.Cr.P. art. 930.8 by sending appropriate written notice to the juvenile and to file written proof that the juvenile received the notice in the record of the proceedings. Therefore, we remand the matter to the juvenile court and instruct the court |into inform the juvenile of the delays for post-conviction relief pursuant to LSA C.Cr.P. art. 930.8.
For the reasons set forth above, we affirm the juvenile’s conviction and sentence, and we remand to the juvenile court to advise Z.S. of the provisions of LSA C.Cr.P. art. 930.8 by sending appropriate *1009 written notice to the juvenile and to file written proof in the record that he received the notice.

AFFIRMED; REMANDED WITH INSTRUCTIONS.

. The minute entry indicates that the juvenile was adjudicated delinquent of first degree robbery, but the transcript reveals that he was adjudicated delinquent of attempted first degree robbery. Where there is conflict between a minute entry and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).

. The “short” male was later identified as the juvenile, Z.S.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).